No. 57,592

STATE OF KANSAS, *Appellee,* v. THOMAS P. BIRD, *Appellant.*

(708 P.2d 946)

162

 Opinion filed October 25, 1985. 

*Robert D. Hecht*, of Scott, Quinlan & Hecht, of Topeka, argued the cause and was on the brief for the appellant.

*Rodney H. Symmonds*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Thomas P. Bird (defendant-appellant) guilty of criminal solicitation. K.S.A. 1984 Supp. 21-3303. The defendant was sentenced to a term of not less than two and a half and not more than seven years' imprisonment. The defendant contends the trial court erred in numerous aspects, including the admission of certain hearsay statements of Lorna Anderson, the taking of and admission of deposition testimony of a State's witness, the admission of evidence concerning Martin Anderson's life insurance, and the failure to give certain cautionary instructions. In addition, the defendant contends the complaint information did not charge an offense, and that the prosecutor was guilty of misconduct during closing argument.

The facts, which are complex, will be stated as briefly as possible since the defendant does not challenge the sufficiency of the evidence.

The State's case was developed primarily through the testimony of Darrel Carter. Mr. Carter was a life-long resident of Lyon County, Kansas, who worked as a self-employed business contractor at the time of trial. He had been married for nineteen years and had three children. He testified that he had become acquainted with Martin and Lorna Anderson through a social sorority. Although he at first claimed he was only socially acquainted with Lorna, he later admitted to having had sexual relations with her.

Carter testified that in May 1983, Lorna approached him and asked him to meet with her at the Faith Lutheran Church in Emporia where she worked as the secretary. She did not tell him what the meeting would be about. A few days later, Carter went to the church as requested. He met with Lorna in her secretarial

office and she introduced him to the pastor of the church, the defendant in this case. Lorna told Carter that the defendant was going to help them kill Martin Anderson. Carter initially said that he didn't want to have anything to do with a murder. He then asked the defendant why he didn't counsel Lorna and Marty or talk to Lorna about getting a divorce. The defendant told Carter that Lorna didn't want a divorce because Martin Anderson had a large insurance policy and she wanted the money and not the divorce. The defendant also said that he loved Lorna and he was doing this to help her. The defendant said he planned to preside over the funeral so that he could be close to Lorna—he indicated that since he was the minister, no one would suspect him. When Carter asked them why they thought he'd participate in the plan as he'd never done anything like it and was not a cold-blooded killer, Carter testified the defendant said, " 'I have—I haven't either . . . I'm a man of God and I'm going to kill Martin Anderson.' "

Carter then testified that the defendant and Lorna outlined two alternative plans to kill Martin Anderson. The first plan was to drug Anderson or get him drunk at his home, load him into his car, take him to a place in the country where there was a bend in the road and a bridge with a 50-foot drop-off into the water, and then push the car over the embankment. Carter was asked if he would be willing to pick the defendant up after he pushed the car over and bring him back to town, thus enabling Lorna to stay at home to establish an alibi. The second plan, which Carter was not asked to help with, involved the defendant's faking a robbery and shooting Anderson to death in a house where Anderson stayed while attending his monthly military reserve meeting in Topeka.

After hearing the plans, Carter became concerned for his own safety, and instead of giving them a definite answer, he said he needed some time to think it over. As he was leaving the church, the defendant told him if anyone asked him why he was there to tell them he'd been discussing the possibility of the church's youth group selling fireworks at Carter's annual fireworks stand.

A few days after the meeting at the church, the defendant came to a job site where Carter was working and asked if he'd made a decision. Carter said that he had not made up his mind.

Later, Carter telephoned the defendant and told him he would

not help. Carter testified that neither the defendant nor anyone claiming to act on behalf of the defendant contacted him to advise him the defendant was no longer going ahead with the plan.

Two other State's witnesses testified that Carter had told them in May or June 1983, that he'd been asked to help kill someone. Neither of the witnesses knew whether or not to believe Carter.

In November of 1983, Darrel Carter's brother Dan was arrested in connection with the shooting death of Martin Anderson in Geary County earlier that month. Dan Carter confessed to having received money from Lorna Anderson. He was charged with conspiracy to commit murder. Darrel Carter contacted his attorney, Michael Patton, to represent Dan. Patton met with the Carter brothers at the Lyon County jail in the early morning hours of November 18, 1983. Darrel took Patton aside and said, "There's a lot more involved here. This concerns the death of Reverend Bird—not the death of Reverend Bird, Sandy Bird; and the Reverend Bird is involved in this." Darrel Carter then told Patton of his May meeting with the defendant and Lorna and about the two murder plans they had outlined.

On December 1, the defendant contacted Jennifer Peterson, a woman with whom Darrel Carter was having a sexual affair, and informed her that he needed to talk to Darrel Carter. Jennifer Peterson relayed the message to Carter, who, in turn, informed his attorney. Patton notified a KBI agent, and it was decided that Carter should phone the defendant in order to set up a meeting. Carter did this and the phone call was recorded and later played to the jury.

Carter and the defendant met in a parking lot on December 10, 1983. Their conversation was recorded and this was also played to the jury. The details of the recorded conversation are not pertinent for purposes of this appeal.

Following Darrel Carter's assistance to the KBI, Danny Carter pled guilty to the reduced charge of criminal solicitation and was released on four years' probation.

The balance of the State's evidence was testimony that indicated the existence of a romantic involvement between the defendant and Lorna Anderson. The purpose of this testimony was to establish a motive.

Although Lorna Anderson was called by the State, she refused

to testify, pleading the Fifth Amendment privilege against self-incrimination.

The defendant took the stand on his own behalf. He claimed that the meeting with Carter was for the sole purpose of discussing whether the church youth group could sell fireworks at Carter's stand. He also denied any involvement beyond that of boss-employee/counselor-client with Lorna Anderson. A good deal of his testimony was spent explaining what he had meant by various statements in the recorded conversation.

After hearing the evidence, the jury found the defendant guilty of criminal solicitation to commit first-degree murder, and the defendant duly perfected this appeal. Further facts will be developed when necessary to discuss the issues raised.

The defendant first contends that the information was defective in that it did not charge a crime or, if it did, was not of sufficient definiteness and certainty to apprise him of the nature and cause of the accusation.

The original information charged:

"[T]hat during the month of May, 1983 in Lyon County, Kansas, one THOMAS E. [sic] BIRD, then and there being, did then and there unlawfully and intentionally request another person, to wit: Darrel D. Carter, to aid and abet in the commission of a felony, to wit: first degree murder, contrary to the form of K.S.A. 21-3303, and against the peace and dignity of the State of Kansas. (Class D Felony)"

An affidavit was attached to the information which specified the details of the meeting between defendant, Lorna Anderson, and Darrel Carter. It also detailed the alleged "plans" for the murder and the way in which Darrel Carter was to participate.

A full preliminary hearing was held on May 31, 1984, and at that time the defendant heard the details of the State's case. At no time did the defendant move for a bill of particulars or move to dismiss or quash the complaint pursuant to K.S.A. 22-3208(3).

On July 20, 1984, a journal entry was filed which contained an amended information charging:

"[T]hat during the month of May, 1983 in Lyon County, Kansas, one THOMAS P. BIRD, then and there being, did then and there unlawfully and intentionally encourage or request another person, to wit: Darrel D. Carter to aid and abet in the commission of a felony, to wit: first degree murder of Martin K. Anderson, contrary to the form of K.S.A. 21-3303, and against the peace and dignity of the State of Kansas. (Class D Felony.)"

The journal entry was approved by both parties and by the

district judge. The amended information was then read to prospective jurors in open court without objection by the defendant. The amended information—and its inclusion of Martin Anderson's name in order to avoid confusion—was mentioned by the court during the discussion of proposed instructions. Again, the defendant did not object, but approved the instruction on criminal solicitation which named Martin Anderson as the intended victim.

The defendant, on appeal, argues the information is fatally defective because it does not allege: (1) that the defendant's conduct was felonious; (2) in what manner or means Darrel Carter was to aid and abet in the murder; (3) whom Darrel Carter was requested to aid and abet; and (4) whom the intended victim of the murder was.

In a felony action, the indictment or information is the jurisdictional instrument upon which the accused stands trial. *State v. Howell & Taylor*, 226 Kan. 511, 601 P.2d 1141 (1979). A conviction based upon an information which does not sufficiently charge the offense for which the accused is convicted is void. Failure of an information to sufficiently state an offense is a fundamental defect which can be raised at any time, even on appeal. See K.S.A. 22-3208(3); *State v. Robinson, Lloyd & Clark*, 229 Kan. 301, 624 P.2d 964 (1981); *State v. Minor*, 197 Kan. 296, 416 P.2d 724 (1966). Sufficiency of the indictment or information is to be measured by whether it contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet, and by whether it is specific enough to make a plea of double jeopardy possible. *Russell v. United States*, 369 U.S. 749, 763-64, 8 L.Ed.2d 240, 82 S.Ct. 1038 (1962). Although the accused has the right to know the nature of the charges against him, the information need not set forth all the specific evidentiary facts relied on to sustain the charge. However, if the allegations in an information fail to constitute an offense in the language or meaning of an applicable statute, the information is fatally defective. *State v. Robinson, Lloyd & Clark*, 229 Kan. 301; *State v. Doyen*, 224 Kan. 482, 580 P.2d 1351 (1978).

In this state, the sufficiency of the information is governed by the guidelines of K.S.A. 1984 Supp. 22-3201(2), which provides:

"The complaint, information or indictment shall be a plain and concise written

statement of the essential facts constituting the crime charged, which complaint, information, or indictment, drawn in the language of the statute, shall be deemed sufficient."

This court has repeatedly held that an information which charges an offense in the language of the statute is sufficient. *State v. Garner*, 237 Kan. 227, 237, 699 P.2d 468 (1985); *State v. Lucas*, 221 Kan. 88, 89, 551 P.2d 1296 (1976); *State v. Barry*, 216 Kan. 609, 619, 533 P.2d 1308 (1974).

In this case, the defendant was convicted of criminal solicitation in violation of K.S.A. 1984 Supp. 21-3303, which provides:

"Criminal solicitation is commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony."

The information, as amended, clearly followed the wording of the statute and alleged each element of the offense.

Although the word "feloniously" was not used in the information, it was clearly stated that the charge was characterized as a felony. Since the statute does not include the word "feloniously," it was not a fatal defect to omit it from the information, especially in light of the use of the words "unlawfully and intentionally" to designate the accused's state of mind.

Nor was it a fatal defect that the information did not allege in what manner or means Darrel Carter was to aid and abet in the murder. The information stated that the defendant intentionally requested Darrel Carter to "aid and abet" in the commission of a felony. This is an essential element of the crime of solicitation. It was unnecessary to add to this the evidentiary details of the "plans" in which Carter was asked to participate in order to charge a crime within the meaning of the statute. The term "aid and abet" has been defined by case law and statute. See *State v. Burton*, 235 Kan. 472, 681 P.2d 646 (1984); K.S.A. 21-3205. Moreover, it is a commonly understood term. Additional specificity was not required in the information. Had the defendant wanted the "manner or means" specified to aid him in his preparation of a defense, he could have requested a bill of particulars pursuant to K.S.A. 1984 Supp. 22-3201(5). This he failed to do.

The defendant also argues that the information did not charge a crime because it failed to allege whom Darrel Carter was to aid and abet. However, this fact is not a necessary element to the

crime of solicitation as stated in K.S.A. 1984 Supp. 21-3303. Therefore, the information does not fail on this point.

The defendant further argues that the information is fatally defective because it does not include the name of the intended victim. This argument is wholly without merit, as the amended information clearly sets forth the intended victim's name.

The defendant has failed to indicate to this court how he was misled or disadvantaged by the information. A full preliminary hearing was held and he was aware of the State's evidence. The defendant at no time moved to quash the information or requested a bill of particulars. We conclude that this information, which employed fully the words of the criminal statute, was sufficient and within the guidelines of K.S.A. 1984 Supp. 22-3201(2).

Since the information charged a crime, the defendant waived any further objections to the definiteness or certainty of the information by failing to raise these objections prior to submission of the case to the jury. K.S.A. 22-3208(3).

The defendant next contends the trial court erred by permitting the State to proceed by deposition in the presentation of the testimony of Jennifer Peterson.

Prior to the trial of this case, on July 20, 1984, the State moved to be allowed to depose Jennifer Peterson, a previously endorsed witness, pursuant to K.S.A. 1984 Supp. 22-3211. At that time, the prosecutor stated:

"We are making our motion pursuant to K.S.A. 22-3211 which does provide for a procedure whereby a witness can be deposed in the event the Court were to find that the witness may be unable to attend or prevented from attending a trial or hearing; that the witness's testimony is material and that it is necessary to prevent a failure of justice."

The court heard testimony from Ms. Peterson's doctor, who was of the opinion that if she were to testify in a public trial, there was an 80% chance that she would have a nervous breakdown and that she might be unable to attend or give testimony. The doctor had been treating Ms. Peterson because she had become distraught, emotionally unsettled, anxious and depressed after an emotional disturbance at her home. Ms. Peterson told the doctor that her stress was caused by her marriage and her involvement in this case. The doctor had hospitalized Ms. Peterson in July and placed her on Triaval, an anti-depressive drug. He had subsequently released her from the hospital

but she remained on medication. The doctor indicated that the drug would not affect Ms. Peterson's ability to give testimony. The doctor was of the opinion that if she were to testify, her problems would recur. The doctor was unable to state whether it would be injurious to Ms. Peterson's emotional health to be deposed, but he thought she would do better with a deposition than she would in open court.

Following this testimony, the prosecutor informed the court that:

"[T]he testimony will show that on or about the first day of December of 1983 that the Defendant went to the residence of Jennifer Peterson; that she resided approximately three houses south of the Defendant's residence here in Emporia; that he went to the residence of Jennifer Peterson, had a conversation with Jennifer Peterson and the Defendant indicated that he would like to reaffirm a trust or a friendship with Darrel Carter and he asked Jennifer Peterson to relay this message to Darrel Carter inasmuch as he felt confident she would be seeing him. Jennifer Peterson indicated that she would have Darrel Carter call the Defendant, and the Defendant at that time in a rather nervous fashion said, 'No, no phones;' and he wanted the contact made in some other way. Jennifer Peterson will testify, in the State's belief, that she thereafter did in fact relay this conversation which she had with the Defendant to Darrel Carter and consequently and thereafter, Darrel Carter did indeed contact the Defendant. In addition, Your Honor, this thing is woven into the taped transcript which the State intends to offer at the time of trial. There was reference at the time of the conversation which was tape recorded between the Defendant and Darrel Carter and which the State does intend to introduce that in fact—and I can't recall the exact wording and I don't have that transcript. It was something to the effect that Darrel Carter said, 'The party that told me doesn't know anything about that;' and the Defendant at that time indicated that he was playing an ace in the hole when he contacted Darrel Carter by the use of Jennifer Peterson. I feel the testimony will also show that Jennifer Peterson and Darrel Carter were at one point at least or I should say the testimony would show that Jennifer Peterson and Darrel Carter had previously had sexual relations."

The defendant then argued that Jennifer Peterson was not an "essential witness" as that term is used in K.S.A. 1984 Supp. 22-3211(4), and, therefore, it was improper to allow her to be deposed.

The court sustained the State's motion to take the deposition pursuant to K.S.A. 1984 Supp. 22-3211, but reserved for trial the issue of the admissibility of the deposition.

At the time of trial, the judge stated the defendant's only question with respect to the admissibility of the deposition was whether or not Jennifer Peterson was an "essential witness."

The court ruled that she was and then allowed her deposition to be read into evidence.

The defendant now argues that the trial court erred by finding Jennifer Peterson an "essential witness" and, therefore, it was error to allow her deposition to be taken. Further, the defendant argues that the use of the deposition at trial was a denial of his Sixth Amendment right to confront witnesses.

K.S.A. 1984 Supp. 22-3211 sets forth four situations in which a witness' deposition can be taken in a criminal proceeding. Subsection (1) provides that upon motion of the *defendant*, the court *may* order the deposition if it appears the witness will be unavailable, that this testimony is material and that it will prevent an injustice. Subsection (1) is not applicable in this case. Subsection (2), which is also inapplicable, deals with when the witness himself moves to be deposed. Subsection (3) sets forth the situation when a *prosecutor* may have a witness deposed. It provides:

"The prosecuting attorney may apply to the court for an order authorizing the prosecuting attorney to take the deposition of any witness for any of the reasons and subject to the limitations stated in subsection (1). Upon the filing of such application, the court shall set the matter for hearing and shall order the defendant to be present at such hearing. If, upon hearing, the court determines that a prospective witness may be unable to attend or prevented from attending a trial or hearing, *that the witness' testimony is material* and that it is necessary to prevent a failure of justice, the court may authorize the prosecuting attorney to take the deposition of the witness." (Emphasis added.)

Subsection (3) gives a trial judge the discretionary power to permit the taking of a deposition of a witness.

Finally, subsection (4) provides that the *prosecutor* may seek a deposition in a felony case if the witness sought is an "essential witness." If the court finds the witness is essential, it *shall* permit the deposition; the court has no discretionary power if the court finds the witness is essential. "Essential witness" is defined by K.S.A. 1984 Supp. 22-3211(10).

There seems to be a discrepancy between the parties in this case as to whether the State was proceeding under subsection (3) or (4). The defendant assumes that the State was using subsection (4) and, since Jennifer Peterson was not "essential," the deposition was improper. The trial judge, at the time of trial, stated that Ms. Peterson was an "essential witness."

It seems apparent to this court, after reading the State's motion, that the State was requesting the court to permit a deposi-

tion pursuant to K.S.A. 1984 Supp. 22-3211(3). The State specifically followed the statutory language in stating its motion. Evidence was presented to establish that the witness would probably be unable to attend because of sickness. The prosecutor outlined the witness' testimony in order to establish its materiality. The court then exercised its power of discretion and permitted the taking of the deposition. The deposition was properly taken under K.S.A. 1984 Supp. 22-3211(3), and as defense counsel acquiesced in the fact the witness was too sick to testify at trial, the deposition was properly admitted at trial. See K.S.A. 1984 Supp. 22-3211(8)(c). The trial judge's statement at trial that the witness was "essential" was unnecessary.

In *State v. Schlicher*, 230 Kan. 482, 485, 639 P.2d 467 (1982), this court stated:

"[G]ranting the right to take depositions in criminal cases is discretionary with the trial court. The court's ruling is to be based on the possible *unavailability* of the witness at the trial." (Emphasis in original.)

We find that the trial court did not abuse the exercise of its power of discretion in allowing Jennifer Peterson to be deposed. The probability of her unavailability was established at the hearing. Her testimony supported the testimony of Darrel Carter about the events leading to the taped conversation and was thus material. Justice was best served by allowing the deposition. Therefore, the requirements of K.S.A. 1984 Supp. 22-3211(3) were met.

In *State v. Hernandez*, 227 Kan. 322, 607 P.2d 452 (1980), this court held that the use of a deposition taken pursuant to 22-3211 does not deprive a defendant of his constitutional right to confront the witness. We noted that a deposition taken pursuant to 22-3211 by its very nature presupposes a strong possibility that the deposition may be used at trial in lieu of the witness; the purpose of 22-3211 is to perpetuate testimony and, therefore, counsel must proceed accordingly. 227 Kan. at 327-28.

The defendant was present at the taking of the deposition where the witness was thoroughly cross-examined by the defense counsel. Further, the defendant himself testified—on direct examination—about his meeting with Jennifer Peterson. Moreover, the defendant did not object when the court ruled that the deposition could be read into evidence. Accordingly, we find the defendant was not prejudiced by the use of this deposition at trial.

The trial court did not err by ordering the deposition to be taken or by having it read into evidence.

The defendant next contends that the trial court erred in allowing certain witnesses to testify as to statements made to them by Lorna Anderson. Darrel Carter, Jan Mead, and Esther Aldrete each testified to statements made to them by Lorna Anderson at times prior to the May meeting when the solicitation allegedly occurred. The defendant argues that all of these statements were erroneously admitted because Lorna Anderson was not charged as a coconspirator in the crime—or identified as a non-charged coconspirator—and the statements were made prior to the conspiracy. Therefore, he contends, the hearsay statements did not meet the requirements of K.S.A. 60-460(i)(2) (the conspiracy exception to the hearsay rule) and should not have been admitted.

Defendant first claims error in the court's admission of testimony by Darrel Carter as to Lorna Anderson's initial contact with him in early May to set up the meeting at the church. However, the defendant made no contemporaneous objection at the times these questions were asked at trial. Because the defendant failed to make timely, specific objections to the testimony he now urges was erroneously admitted, the point is not properly before this court on appeal. *State v. Murdock*, 236 Kan. 146, 153, 689 P.2d 814 (1984); K.S.A. 60-404.

The defendant next contends the court erred in allowing Jan Mead to testify concerning statements made to her by Lorna Anderson concerning Lorna's "affair" with the defendant. Jan Mead, who lived in Wichita and supervised Lorna's work in the Heart Association campaign in Emporia, was permitted to testify that on January 27, 1983, she and Lorna went to a local club for a drink and the conversation turned to men. Lorna confided in Jan Mead about some of her extramarital affairs and her unhappy marriage.

Lorna continued to confide in Jan Mead and in February or March, her conversations began to focus on one individual. It was in February that Jan learned Lorna was working part time at the church; Jan testified that, in explaining her job, Lorna said, " 'Tom and I are seeing each other, and this is one chance that we have to be alone and I enjoy working there.' "

Jan further testified that in March, Lorna began using her part-time work for the Heart Association as an excuse for afternoon trips to Wichita or Topeka. According to Jan, Lorna would call her and say, " 'I've told my husband I'm going to meet with you in Wichita; and if he calls, would you tell him that I'm on my way to or from to meet with you.' " Also in March, Lorna said to Jan, " 'He's pretty good in bed for a minister.' "

Jan testified that on April 19, Lorna met her for a cup of coffee and told her that things between her and her husband were much worse, and that she was getting much more involved with the defendant. Jan testified Lorna said, " 'I know this sounds really awful but sometimes I just wish something would happen to Marty and his wife so Tom and I could spend the rest of our lives together.' "

During the latter part of March or early April, Lorna told Jan about a trip to a small town that she and the defendant had taken within the last few days. Lorna said it was nice to be in a small town so she could walk down the street holding hands with the defendant.

Finally, Jan Mead testified that in early April Lorna said that one of her daughters had seen her kissing Tom. Lorna was afraid the child might mention it to her father, Martin Anderson. The defendant argues these statements were not admissible as statements of a coconspirator under K.S.A. 60-460(i)(2), since they were made prior to the alleged solicitation and since Lorna was not charged or identified as a coconspirator.

At the time of trial, the State contended the statements which Lorna Anderson made to Jan Mead were admissible under K.S.A. 60-460(j) and did not argue that the statements were admissible under K.S.A. 60-460(i). A hearing was held outside the presence of the jury in order to determine the trustworthiness of the statements. Counsel for defendant was permitted to cross-examine the witness during this hearing. The court ruled the testimony was trustworthy and admissible as statements against interest under 60-460(j). In making its ruling, the trial court stated:

"It would appear to the Court that at the time the Declarant made these statements she was a married woman and the Defendant was a married man, and it would certainly—that type of a statement would I believe in this community and most others subject the declarant to the object of hatred, ridicule or social disapproval in the community. And so the Court would find that based upon what

I've seen here now and having an opportunity to observe this witness under direct and cross that those statements would not be suppressed."

In *State v. Myers*, 229 Kan. 168, 171, 625 P.2d 1111 (1981), we noted that in a criminal trial, before admitting hearsay evidence under one of the exceptions to the hearsay rule, a trial court must also consider the application of the confrontation clauses as contained in the Sixth Amendment to the United States Constitution and also in section 10 of the Bill of Rights of the Kansas Constitution. We held that the confrontation clause requires a showing (1) that a witness not present for cross-examination is unavailable, and (2) that the statement bears adequate indicia of reliability or guarantees of trustworthiness. p. 174.

Both showings were made in this case. Lorna Anderson was unavailable as she had exercised her Fifth Amendment privilege against self-incrimination. Moreover, the court made a finding of trustworthiness prior to admitting the statements.

In *State v. Myers*, 229 Kan. at 174-76, this court held that a confession made by an accomplice to his wife which implicated the defendant, was unreliable and not trustworthy. The case at bar is easily distinguishable. The statements Lorna made to Jan Mead were not a confession to a crime nor did they implicate the defendant in the crime charged—the statements were simply offered to show the defendant's *motive* to commit the offense. Also, Lorna had no expectation of privacy, or a confidential relationship, with Jan Mead.

Accordingly, we hold that the defendant was not denied his right of confrontation by the admission of these statements.

Moreover, we find that the statements were properly admissible under 60-460(j), which states:

"Subject to the limitations of exception (f), a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable man in the declarant's position would not have made the statement unless the man believed it to be true."

We cannot say that the trial court abused its power of discretion by admitting the hearsay statements under 60-460(j).

Since the statements were properly admissible under a hearsay exception and the defendant was not denied his right of confrontation, we need not consider the defendant's argument

concerning the applicability (or, rather, inapplicability) of K.S.A. 60-460(i) to these statements.

Finally, defendant challenges the admissibility of the testimony of Esther Aldrete—Lorna Anderson's babysitter—as to statements she overheard Lorna Anderson make while speaking on the telephone on April 23, 1983. Ms. Aldrete testified that she heard Lorna say, " 'I cannot wait for Marty to die. I wanted to spend—I wanted to count his green money or green stuff. . . . I can't—I cannot wait for Marty to die. I can't wait to count the green stuff.' "

When admitting this testimony at trial, the court did not specify which hearsay exception it was applying. The defense counsel objected to its admission on grounds of trustworthiness. The court overruled the objection.

On appeal, the defendant argues only that the testimony was inadmissible under K.S.A. 60-460(i)(2) as a vicarious statement by a coconspirator. The defendant contends that since Lorna Anderson was not charged as a conspirator, the statement was made on April 23 (well before the May "conspiracy" meeting with Darrel Carter) and the statement was not in "furtherance" of the conspiracy, K.S.A. 60-460(i)(2) is inapplicable. Based on this reasoning, the defendant contends the trial court committed reversible error by admitting the testimony.

The State, in its brief, does not address the defendant's arguments directly, but states there was no error on the part of the trial court because: (1) the defendant failed to make a contemporaneous objection, and (2) the statement was admissible as a declaration against interest pursuant to K.S.A. 60-460(j).

While we agree with the State's position that the trial court did not err in admitting this testimony, we disagree with its reasons. First of all, the defendant's objection as to the "trustworthiness" of the proffered statement was adequate to preserve the issue for appeal. Second, we find the statement was admissible pursuant to K.S.A. 60-460(i)(2) rather than K.S.A. 60-460(j).

K.S.A. 60-460(i) provides as follows:

"As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination . . . ."

This exception to the rule against admitting hearsay estab-

lishes five prerequisites to its application: (1) the person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been outside the presence of the accused; (4) the statement of the coconspirator must have been made while the conspiracy was in progress; and (5) the statement must be relevant to the plan or its subject matter.

Further, even if all five of these elements are satisfied, the testimony is not admissible unless evidence, other than the proffered out-of-court statement, is already in the record which establishes a "substantial factual" basis for a conspiracy between the defendant and the declarant. *State v. Nirschl,* 208 Kan. 111, Syl. ¶ 2, 490 P.2d 917 (1971). In *State v. Borserine,* 184 Kan. 405, 410-11, 337 P.2d 697 (1959), this court indicated that a substantial factual basis may be something less than prima facie proof:

"Where proof of the conspiracy depends on a vast amount of circumstantial evidence—a vast number of isolated and independent facts—[prima facie proof prior to the introduction of third party testimony] cannot be required. In any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced at the trial taken together shows that a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before, or after, the introduction of such acts and declarations."

See also *State v. Sherry,* 233 Kan. 920, 934, 667 P.2d 367 (1983).

The evidence in this case clearly showed that there was a conspiracy between Lorna Anderson and the defendant to murder Martin Anderson at the time of their May meeting with Darrel Carter. However, there is no direct evidence to show the conspiracy existed on April 23, the day the babysitter overheard Lorna's statements about wanting to "count the green stuff." Accordingly, the defendant argues that the element of 60-460(i)(2) which requires the statement to have been made "while the plan was in existence" has not been satisfied.

We disagree. Although there is not direct evidence that Lorna and the defendant had already conspired to kill Martin Anderson at the time Lorna made these statements on April 23, there is abundant circumstantial evidence which shows this must have been the case. For instance, Jan Mead testified that on April 19, Lorna made the statement that she sometimes wished "something" would happen to Martin and the defendant's wife so that she and the defendant could be together. Jan Mead's

testimony indicated that the defendant and Lorna were deeply involved in their affair as early as March. Also, in April, Lorna and Martin Anderson took out a new life insurance policy. Then, during the first week in May, Lorna took out an additional policy on Martin's life. Moreover, by the time the defendant and Lorna met with Darrel Carter in May, they had established two alternative murder plans in great detail, indicating they had put some time and thought into these plans. Based on all of these factors, this court finds there was sufficient evidence to establish a conspiracy existed when Lorna made the statements overheard by the babysitter on April 23.

The defendant also argues that since the statement was not in "furtherance" of the conspiracy it is inadmissible under 60-460(i)(2). Defendant cites *State v. Borserine*, 184 Kan. 405, as authority. When the *Borserine* opinion was written in 1959, the hearsay exceptions had not yet been codified. The common-law coconspirator exception did require the statement to be one in *furtherance* of the conspiracy. However, when the hearsay exceptions were codified in 1963, this requirement was intentionally left out. See 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(i)(1979). K.S.A. 60-460(i)(2) requires only that the statement be *relevant* to the plan. See *State v. Sherry*, 233 Kan. at 934. Lorna's statement was clearly relevant to the plan to murder Martin Anderson, thereby enabling her to obtain his insurance proceeds.

Finally, the defendant argues the statement is inadmissible because Lorna was not charged with conspiracy. However, the law is clear that evidence is admissible to show a conspiracy between the defendant and the declarant even though the latter was not joined in the information and no conspiracy was charged therein. *State v. Borserine*, 184 Kan. at 408; see also *United States v. Nixon*, 418 U.S. 683, 701, 41 L.Ed.2d 1039, 94 S.Ct. 3090 (1974); *State v. Campbell*, 210 Kan. 265, 277, 500 P.2d 21 (1972).

In summary, we find there was evidence in the record establishing a substantial factual basis for a conspiracy prior to the admission of the proffered statement. Further, the statement satisfied the five requirements of 60-460(i)(2): (1) the person testifying (Esther Aldrete) was a third party; (2) the out-of-court statement was made by one of the coconspirators (Lorna Ander-

son); (3) the statement was made outside the presence of the defendant; (4) the statement was made while the conspiracy was in progress; and (5) the statement was relevant to the plan to murder Martin Anderson. Therefore, we hold the statement was properly admitted pursuant to K.S.A. 60-460(i)(2).

The next issue raised by the defendant is whether the trial court erred in admitting evidence concerning Martin Anderson's life insurance. Testimony was received from the Andersons' insurance agent as to the kind of policy the Andersons had purchased, and the amount of coverage from 1982 through 1983. He also testified that all policies were on the life of Martin Anderson with Lorna Anderson named as the primary beneficiary.

The defendant acknowledges that evidence concerning insurance on Martin Anderson's life could be admissible to establish motive *if* it were shown the defendant was aware of the insurance. However, the defendant contends there was *no* evidence that defendant had knowledge of the existence of the insurance and, therefore, the court erred by admitting the evidence.

We note that there was evidence presented which proved defendant's knowledge of the life insurance. Darrel Carter testified that at the meeting in May with the defendant and Lorna Anderson when he was told of the plans to kill Martin Anderson, he asked, "Tom, you're the minister here at the church. . . . Have you ever, you know, talked to Lorna about counseling and why, you know, don't you talk to her about getting a divorce. . . . That would be a lot easier thing to do." Carter then testified that "[t]he defendant told me that Lorna didn't want a divorce, that Martin Anderson had a large insurance policy and that she didn't want the divorce, that she wanted the money and the only way that they could get the money was if Martin Anderson was dead."

It is clear in light of the foregoing testimony that the defendant's contention that there was no evidence the defendant knew about the insurance is without merit. Therefore, the State did not err in admitting evidence of Martin Anderson's life insurance for the purpose of establishing motive.

The defendant next argues that the prosecutor's closing argument was improper, inflammatory, and so prejudicial to the defendant as to prevent a fair trial. Specifically, the defendant complains of the following remarks:

"And to come in here and insult the intelligence of the people of this county with that sort of nonsense. We've all seen love letters. We all know. what those are referring to.

". . . The question is why, why would the minister, why would a man who purports and sits there on Sunday morning proclaiming to be a man of God, why would this man become involved in a plot to kill a parishioner's husband?

. . . .

". . . And by golly, if I had just confessed to my involvement in a murder charge that was underway over there, I think I would get me a bulletproof vest over there, too, if somebody had already been killed and I had been the type that made a confession to it.

. . . .

". . . This was a defendant that felt very confident; just what he said that day, 'I'm a man of God and nobody will be suspicious of me.' And even today he hides behind that. Even today they bring in the character witnesses; basically say, 'Gee, he's a minister and we all know ministers read the Bible.' Ladies and gentlemen, we've all been raised; we've all been taught to respect people who are ministers, who are priests, who are men of the cloth. We all do. Those persons who are entitled to respect should receive it. And those persons who would abuse their position have no right to expect that to save their neck when they're sitting here on trial.

. . . .

". . . Ladies and gentlemen, with respect to this matter, these statements, you can sit there and tell me a hundred times that those statements aren't incriminating, and I heard those explanations and I still just quake to think anybody would actually believe somebody would swallow it."

The record reveals defendant made no objection during the State's argument. Nor was a request made to admonish the jury to disregard the allegedly improper remarks. Under such circumstances, we must conclude the defendant waived this claim of error concerning the closing argument. Reversible error cannot be predicated upon a complaint of misconduct of counsel during argument where no contemporaneous objection is lodged. *State v. Pink*, 236 Kan. 715, 724, 696 P.2d 358 (1985); *State v. Lilley*, 231 Kan. 694, 698, 647 P.2d 1323 (1982); *State v. Arney*, 218 Kan. 369, 374, 544 P.2d 334 (1975); *State v. Johnson*, 210 Kan. 288, 297, 502 P.2d 802 (1972); *State v. Fleury*, 203 Kan. 888, 896, 457 P.2d 44 (1969).

We cannot accept defendant's argument that a contemporaneous objection is not necessary to preserve the issue for appellate review where there has been "plain error." The defendant cites numerous federal cases in support of this "plain error" rule. However, Kansas does not follow the "plain error" rule utilized

in the federal courts. *State v. Fisher*, 222 Kan. 76, 83-84, 563 P.2d 1012 (1977). Therefore, failure to comply with the contemporaneous objection rule bars a challenge to a conviction in a state court.

Even if the defendant in this case had preserved his objection for appellate review, we would not find reversible error. All of the statements of which the defendant complains occurred in the State's rebuttal argument, after the defendant made his closing argument, and were in reply to statements made by defense counsel.

The defendant, in closing, claimed the cards recovered from Lorna's home were selected at random by the defendant and only expressed the defendant's Christian love for Lorna. These cards (or letters) were found in Lorna's bedroom in her lingerie drawer. The cover of one of the cards read, "Miss you, miss you, miss you; Everything I do Echoes with the laughter And the voice of you." The cards contained amorous inscriptions in the defendant's handwriting and one was signed, "Love you Always Tom." The prosecutor's comments about these cards were fair comments on the evidence.

The prosecutor's statements in regard to the bulletproof vest worn by Darrel Carter when he met with the defendant in the parking lot were in response to the defense counsel's argument that "[a]nyone who has a bulletproof vest at home is running in, pardon the expression from the tape, a different crowd than I'm familiar with."

Defense counsel argued that Darrel Carter concocted the story, admitted to lying under oath, and that his story was "bizarre" and "utterly ridiculous." The defense counsel further argued, "It would take a complete idiot to do anything that wild and crazy." The prosecutor responded by explaining how the evidence showed that the defendant thought his position in the community would help him conceal his crime.

Defense counsel, in the closing argument, said that the defendant did not make one incriminating statement in the entire taped conversation with Darrel Carter. The State responded by commenting on the weakness of the defendant's explanations for his statements recorded on tape.

The prosecutor's comments were founded upon matters in evidence. Most were in response to the defendant's closing

argument. In *State v. Hanks*, 236 Kan. 524, 532, 694 P.2d 407 (1985), we reiterated the following:

" 'The prosecutor is entitled to considerable latitude in arguing the case to a jury. *State v. Potts*, 205 Kan. 47, 468 P.2d 78. There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel.' "

We conclude that the arguments complained of did not exceed the limits of fairness and were not prejudicial to the defendant.

Finally, the defendant contends the trial court committed plain error by failing to give cautionary instructions when receiving statements of Darrel Carter and statements attributable to Lorna Anderson. The defendant contends that although neither Darrel Carter nor Lorna Anderson were charged as coconspirators with the defendant, it is clear from the evidence that they had criminal culpability. The defendant alleges that failure to give cautionary instructions when receiving as evidence statements made by accomplices or coconspirators is "plain error" affecting the substantial rights of a defendant, thus requiring a reversal of the conviction.

The defendant's argument lacks merit for several reasons. First, we disagree that the evidence showed Darrel Carter had criminal culpability thereby making him an "accomplice." Second, the instruction was not requested and K.S.A. 22-3414(3) provides in substance that no party may assign as error the failure to give an instruction unless the matter was properly presented to the trial court. *State v. Diaz & Altemay*, 232 Kan. 307, 316, 654 P.2d 425 (1982); *State v. Trujillo*, 225 Kan. 320, 324, 590 P.2d 1027 (1979); *State v. Bell*, 224 Kan. 105, 108, 577 P.2d 1186 (1978). Further, this court has held that there is no duty to give a cautionary instruction when receiving accomplice testimony unless such instruction is requested, but if such an instruction is requested and is not given, the result *may* be error. *State v. Moore*, 229 Kan. 73, 80, 622 P.2d 631 (1981). We stated that the warning is desirable, but it is never an absolute necessity. 229 Kan. at 80.

We note that although no cautionary instruction was given, the jury was instructed on its duty to consider the weight of the evidence and credibility of witnesses.

In light of the foregoing considerations, we find the trial court had no duty to give a cautionary instruction to the jury prior to

héaring Darrel Carter's testimony. Therefore, no error was committed by the trial court and the defendant's argument is without merit.

The judgment of the lower court is affirmed.