STATE OF HAWAII, Plaintiff–Appellant, v. EDWARD MARTIN ROTHMAN, also known as Fast Eddie, WILLIAM W. MAGERS, ALFRED J. SAMANGO, also known as Fred, and TONY M. SANCHEZ, also known as Squiddy, Defendants–Appellees

NO. 12929

(CR. NO. 87–0732)

AUGUST 10, 1989

LUM, C.J., NAKAMURA, PADGETT, AND HAYASHI, JJ., AND INTERMEDIATE COURT OF APPEALS ASSOCIATE JUDGE TANAKA, IN PLACE OF WAKATSUKI, J., EXCUSED

OPINION OF THE COURT BY PADGETT, J.

This is an appeal by the State of Hawaii (State), from an order below, suppressing all information seized as a result of the installation of a pen register on appellee Edward M. Rothman's (appellee) telephone line, all information supplied to the Office of Narcotics Enforcement by the Hawaiian Telephone Company as to the numbers of incoming calls on that line pursuant to a warrant, all things seized on searches, pursuant to warrants, from appellee's house and from his alleged bookkeeper's house (Valentine), and all evidence derived from the seizures. The order appealed from was a part of a document entitled "Decision and Order Granting in Part and Denying in Part Defendant's Motion to Suppress Testamentary, Physical and Derivative Evidence". The decision and order, and the findings of fact and conclusions of law contained therein, were entered after extensive hearings conducted before the court below.

For the reasons hereinafter stated, we affirm.

Since there is usually considerable public interest in high profile cases of this nature, a thorough exegesis of the facts in this case, and of our reasoning in applying the pertinent law, and constitutional principles, thereto, may serve some useful purpose. As always, we must follow the fundamental principles that every person accused of a crime is presumed

innocent until proven guilty, that an indictment is an accusation only, and that the existence of an indictment does not diminish the indicted person's constitutional rights one single iota. Our system of justice, and the continued existence of ordered liberty, under our constitution, require that these principles be adhered to.

We are here dealing with three warrants. The first, in point of time, was an order authorizing the installation by the Office of Narcotics Enforcement of a pen register on appellee's telephone line and ordering the Hawaiian Telephone Company to program all Electronic Automatic Exchanges to identify the numbers at which calls to appellee's telephone originated, and to supply those numbers to the Office of Narcotics Enforcement. This warrant was twice extended.

The second and third were warrants, issued the same day appellee was indicted, for the search of the home of Valentine and of appellee's home, respectively.

The original pen register warrant was filed September 5, 1986 and extended by orders dated October 14, 1986 and November 17, 1986. There is a procedural peculiarity in the warrant, and the extensions, in that the affidavits, upon which the warrant issued, and upon which the extensions issued, as well as the warrant, and the extension orders, are all entitled "In the Circuit Court of the First Circuit State of Hawaii" but the warrant and the extensions were signed by a district court judge as "Judge of the Above–Entitled Court" and were filed in the District Court of the First Circuit.

The search warrants for appellee's house and Valentine's house were both entitled "In the District Court", signed by a district court judge, and filed in the District Court. They both describe the property to be searched for as follows:

> books, papers, documents, records, receipts, billings, and statements, including but not limited to ledger books, diaries, journals, or other writings, all of which relate to Promoting a Dangerous Drug in the First Degree or Criminal Conspiracy. Also such articles of personal identification including driver's licenses, utility bills, rent receipts, keys and other articles which tend to show ownership or possession of the above described articles, and such currency as may constitute proceeds of drug transactions, pursuant to Section 803–32 of the Hawaii Revised Statutes, as amended, and Rule 41 of the Hawaii Rules of Penal

Procedure, as property that constitutes evidence of the commission of an offense, or property designed or intended for use of which, or has been used as the means of committing an offense[.]

The affidavits upon which the warrants issued say in substance that based upon information, which is set forth in some detail, (1) appellee had been engaged in certain particularly described drug transactions including a conspiracy to promote a dangerous drug, that (2) Madeline Valentine was his bookkeeper and, that, based on the affiant's experience, (3) persons engaged in drug transactions and conspiracies, keep books to record their transactions, and to conceal their transactions.

There is nothing in the affidavits which avers the existence of any particular document, such as a bill of lading, or receipt for drugs, a check written to pay for drugs, or anything else of that nature. According to the affidavit, one of the informants, who was not known to be reliable, said that appellee had told him to get payment for certain personal services from Madeline Valentine, but the affidavit does *not* say what those personal services were. Presumably they had nothing to do with drugs, or the affidavit would have so stated.

The affidavits do not say that appellee, or anyone, had said that Valentine had records of drug transactions, or that appellee had, or was keeping, or had said that he had, such records, or that anyone had told the affiant about even one piece of paper which appellee had, or said he had, or Valentine had, or appellee or Valentine, said she had, concerning any drugs, or drug transactions, or conspiracy.

The manner of the execution of the two search warrants on July 2, 1987, was aptly, and correctly, set forth by the judge below in his findings. He said:

**Search of Defendant's Home**: Shortly after 7:00 a.m. on July 2, 1987, a team of approximately eleven police officers arrived at Defendant's house. Upon arrival, members of the team took up security positions around the perimeter of Defendant's home and several officers approached the front door of the home. To the left of the front door was a picture window which was somewhat larger than the front door. The house was a three–story structure. At that time, the officer in charge of the security team was aware that the master bedroom was on the third level. However, he had no knowledge of where Defendant

was in the house or whether Defendant or anyone else was in the house. There were no lights or activity in the house. This officer had heard that Defendant had "strong–armed" individuals who dealt in drugs and was aware generally of the risk of danger in the execution of a search warrant. He was also made aware by an ONE [Office of Narcotics Enforcement] agent that a defendant had told a confidential informant who told an ONE agent that more than a year prior to the search, Defendant had pointed a rifle at the informant, without the informant's knowledge, and that the rifle was kept under the bed in the master bedroom. However, no attempt was made by the security team which [initially] entered the house to look for the rifle under the bed or to check for the presence of persons in the house other than Defendant, his wife and child. Moreover, no attempt was made by the searching party to locate the rifle in the area which was apparently known to them. Rather, an ONE agent testified that she [happened] to see a rifle case under the bed as she was climbing the stairs to the master bedroom. The photograph of the view from the stairs indicates that the agent could not have seen the rifle case under the bed.

The officer in charge of the security team twice knocked on the front door and announced his presence and his possession of a warrant. His demonstration of his knock and [announcement] indicates that it took approximately ten seconds. Without looking into the window next to the front door, which would have given him a view of the interior of the house and part of the stairs leading up to the master bedroom, he ordered another officer to break down the front door. This was done immediately. Approximately fifteen but no more than twenty seconds lapsed from the first knock on the front door to the entry of the officers into the house. His reason for the immediate entry into the house was to prevent anyone from gaining a position of advantage. Prior to the breaking of the front door, there was no indication of any activity within the house, no lights being turned on, no furtive or threatening gestures by anyone and no apparent refusal to open the door.

The searching party at Defendant's house searched for and seized virtually any writing, document, etc., which related to

Defendant's finances and/or which tended to identify Defendant. The searching party looked for and recovered any item which might have, as opposed to did have, evidentiary value. Even though an item had no apparent evidentiary value, the item was recovered on the theory that it could later be tied into other evidence. The agent in charge interpreted the warrant to authorize the seizure of such items. As a result, a birthday card which was sent to the Defendant by his father was seized because it could identify co-conspirators. Family pictures were taken because they "appeared" to show in the background a geographical location similar to "South America."

**Search of Valentine House:** The searching party here also searched for and recovered virtually every item which could be identified with Defendant regardless of its evidentiary value. As in the case of the search of Defendant's house, highly personal items having no apparent evidentiary value were recovered as being within the scope of the warrant. Further, items were recovered from the Valentine house virtually sight unseen. Documents which were not even examined by any member of the searching party were seized. The agent in charge of this search interpreted the warrant to authorize the search for and seizure of any items which related to Defendant.

## THE "PEN REGISTER" WARRANT

Since the warrant authorizing the pen register telephone tap, and its extensions, preceded, in time, the warrants for the search of Valentine's house, and appellee's house, and since information obtained by the pen register was used, in the affidavits, in support of the warrants for the house searches, we deal first with the suppression of the evidence obtained by, and as a result of, the pen register and electronic automatic exchange devices. The problem is one of considerable complexity and difficulty.

The Hawaii State constitutional provisions involved are Sections 6 and 7 of Article I of the Constitution which read as follows:

**Section 6.** The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.

**Section 7.** The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

It appears, from the facts, that a pen register records the numbers called *from* a particular telephone, while the Electronic Automatic Exchange can be programmed to produce a printout of the numbers of all *incoming* calls to a particular telephone.

Hawaii has a statute with respect to electronic eavesdropping which is Part IV, Hawaii Revised Statutes (HRS) Chapter 803 and runs from. §§ 41 through 49. The definition of a "wire communication" in HRS § 803–41 is as follows:

"Wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate, or foreign communications.

HRS' § 803–42 prohibits the interception and disclosure of wire communications except as specifically provided in Part IV of Chapter 803 but provides in subsection (b)(4) that:

(4)    It shall not be unlawful under this part for any person to intercept a wire, wireless, or oral communication or to disclose or use the contents of an intercepted communication, when such interception is pursuant to a valid court order under this chapter or as otherwise authorized by law; provided that a communications carrier with knowledge of an interception of communications accomplished through the use of the communications carrier's facilities shall report the fact and duration of the interception to the administrative. director of the courts of this State.

HRS § 803–44 allows the prosecuting attorney to:

make application to a circuit court judge, designated by the chief justice of the Hawaii supreme court, in the county where the interception is to take place, for an order authorizing or approving the interception of wire or wireless communications[.]

HRS § 803-46 provides the procedure for authorizing the interception of wire communications. Its requirements are stringent, and detailed. They were not followed in obtaining the warrant and the extensions in this case.

The general statutory authorization for search warrants appears in HRS §§ 803-31 and 803-32, which read as follows:

§ 803-31 **Search warrant; defined.** A search warrant is an order in writing made by a judge or other magistrate, directed to an officer of justice, commanding the officer to search for certain articles supposed to be in the possession of one who is charged with having obtained them illegally, or who keeps them illegally, or with the intent of using them as the means of committing a certain offense.

§ 803-32 **Purposes.** The power of granting this writ is one in the exercise of which much is necessarily left to the discretion of the magistrate, but, except in cases where this power is elsewhere specially granted by statute, search warrants can be granted only for the following purposes:

(1) To seize any article or thing the possession of which is prohibited by law;

(2) To discover property taken by theft or under false pretenses, or found and fraudulently appropriated;

(3) To seize forged instruments in writing, or counterfeit coin intended to be passed, or the instruments or materials prepared for making them;

(4) To seize arms or munitions prepared for the purpose of insurrection or riot;

(5) To discover articles necessary to be produced as evidence or otherwise on the trial of any one accused of a criminal offense.

In addition, Hawaii Rules of Penal Procedure (HRPP) 41 provides in paragraphs (a), (b) and (c) as follows:

(a) **Authority to Issue Warrant.** A search warrant authorized by this rule may be issued by any district or circuit

judge within the circuit wherein the property sought is located. Application therefor should be made to a district judge wherever practicable.

(b) **Property Which May Be Seized With a Warrant.** A warrant may be issued under this rule to search for and seize any (1) property that constitutes evidence of the commission of an offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing an offense. The term "property" includes documents, books, papers and any other tangible objects.

(c) **Issuance and Contents.** A warrant shall issue only on an affidavit or affidavits sworn to before the judge and establishing the grounds for issuing the warrant. If the judge is satisfied that the grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part. Before ruling on a request for a warrant the judge may require the affiant to appear personally, and may examine under oath the affiant and any witnesses he may produce, provided that such proceeding shall be taken down by a court reporter or recording equipment and made part of the affidavit. The warrant shall be directed to a police officer or some other officer authorized to enforce or assist in enforcing any law of the State of Hawaii or any political subdivision thereof. It shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified. The warrant shall contain a prohibition against execution of the warrant between 10:00 p.m. to 7:00 a.m., unless the judge permits execution during those hours in writing on the warrant. It shall designate the judge to whom it shall be returned.

Had the warrant, and its extensions, which were prepared for signature by a circuit judge, been taken to, and signed by, the circuit judge designated under HRS § 803–44, after following the requirements of HRS § 803–46, there would be no problem. That, however, was not done. Appellant urges us to rule that either (1) no warrant was required to obtain

the numbers of calls to and from appellee's telephone or (2) the "pen register" warrant signed by the district judge was valid.

The appellant's argument begins with the proposition that the telephone number information intercepted was not a "wire communication" as defined in our statute. The parallel provision in the federal wiretap law, 18 USCS § 2510(1), was construed not to include the telephone number information with which we are here dealing in *United States v. New York Tel. Co.*, 434 U.S. 159, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977).

If, however, the information obtained by the use of the devices in question is not a "wire communication", what is it? It is not an "article" or "thing" that possession of which is prohibited by law. It is not "property" taken by theft or under false pretenses or found and fraudulently appropriated; it is not a "forged instrument" in writing or a "counterfeit coin" or an "instrument" or "materials" prepared for making counterfeit coins; it is not "arms or munitions"; and it is not "articles" necessary to be produced as evidence. It therefore does not literally fall within the scope of those things for which a search warrant is authorized under HRS § 803-32.

The same can be said on a literal interpretation of HRPP 41(b). The information is not "property" that constitutes evidence of the commission of an offense or contraband, the "fruits of crime" or "things" otherwise criminally possessed, or "property" designed and intended for use or which is or has been used as the means of committing an offense. As that section of the rule points out, property includes documents, books, papers and any other "tangible" objects. The telephone information seized is none of the above.

It is true, however, that the Supreme Court of the United States, in *New York Telephone, supra*, construed the equivalent language, in the federal criminal rules, as authorizing a federal magistrate, or judge of a state court of record within the district, to issue a warrant for the use of a pen register.

Nevertheless, read literally, neither the statutes, nor the rule authorize the issuance of a warrant for the installation of a pen register to obtain information if it is not a "wire communication" as defined in the statute.

The United States Supreme Court in *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), held that, for purposes of the Fourth Amendment of the Federal Constitution, the installation of a pen register was not a "search" for which a warrant is required. The prosecution urges us to similarly construe our constitution. Even if, however, we

were willing to adopt that construction with respect to Article I, Section 7 of our State Constitution, which parallels the Fourth Amendment to the United States Constitution, the Hawaii Constitution has, in addition, an expressed right of privacy set forth in Article I, Section 6.

We agree with the trial judge that persons using telephones in the State of Hawaii have a reasonable expectation of privacy, with respect to the telephone numbers they call on their private lines, and with respect to the telephone numbers of calls made to them on their private lines. That is, they have a reasonable expectation that the government will not tap their private telephones to obtain such information, or require the telephone company to supply such information to it, unless the government has obtained a proper and legal warrant therefor. Therefore, before the Office of Narcotics Enforcement can install, on such a line, a device such as the pen register, or require the telephone company to (1) program its Electronic Automatic Exchange to record the numbers from which incoming calls are made to that private line and (2) supply the information obtained to that Office, a warrant, issued in accordance with law, is required, since otherwise the right of privacy guaranteed under Article I, Section 6 is impermissibly violated. Despite appellant's argument to the contrary, this does not seem, to us, to impose any undue burden on the law enforcement authorities.

With respect to HRPP 41, we are unwilling to follow the United States Supreme Court in *New York Telephone* and stretch, or, more aptly, twist the language of that rule to authorize district and circuit judges to issue warrants for the installation of pen registers under it, and we are likewise unwilling to stretch, or twist, the language of HRS § 803–32 to provide a basis for the issuance of such warrants.

Appellee, on the other hand, urges us, first, to hold that the telephone numbers information is a "wire communication" subject to the stringent requirements of HRS Chapter 803, part IV, before a warrant can issue. We cannot agree. The definitions of "oral communication", "wire communication" and "wireless communication" in the statute are not broad enough to encompass telephone number information. Consequently, we agree with the judge below and *New York Telephone, supra*, on this point.

Alternatively, appellee urges that the information is not obtainable by warrant. Again, we cannot agree. Since the legislature has authorized the electronic interception of telephone conversations by statute, it would

be anomalous to hold that, because the lesser privacy invasion, of intercepting telephone numbers, was not within the literal definition of a "wire communication", no warrant at all could issue authorizing the installation of a pen register, upon a showing of sufficient probable cause.

With respect to the interception of telephone conversations, the legislature has spoken clearly and unmistakenly. Only the circuit court judge authorized by the chief justice in the particular circuit can issue a warrant for electronic eavesdropping.

The judge below followed *New York Telephone* with respect to Part IV of HRS Chapter 803, and held that the telephone numbers intercepted were not "wire communications". However, he found power, in the circuit court, to authorize the installation of such devices in HRS §§ 603–21.5 and –21.9. The language of HRS § 603–21.9(6) is certainly broad enough to authorize circuit judges, in the exercise of the power over criminal offenses, given them under HRS § 603–21.5, to issue search warrants for the installation of such devices and the obtaining of such information.

Language similar to HRS § 603–21.9(6) appears in the chapter on district court at HRS § 604–7(e). However, the powers of the district judges are to be exercised to carry into effect their powers given by law, and their jurisdiction on criminal cases are severely limited by HRS §§ 604–8 and –9. The pen register warrant here was issued in an alleged felony case, and consequently could be issued only by a circuit judge.

We agree, therefore, that under the statutes a circuit judge, and only a circuit judge, had the power to issue the warrant in question. Accordingly, since the warrant and the extensions thereof were signed by a district judge, they were invalid.

The prosecution argues that the officer who obtained the search warrant was acting in good faith in going before a district judge, and that we should therefore follow *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), and uphold the warrant. However, for purposes of Hawaii State constitutional law, we have yet to adopt the good faith rule pronounced in *Leon*.

Moreover, even if we were to adopt the good faith test, it would avail the prosecution nothing in this case, for the trial judge, based upon substantial evidence, rejected the claim that the warrant was taken to the district judge, rather than the circuit judge, in good faith.

The officer who signed the affidavit and obtained the judge's signature had 11 years experience in the narcotics field. The papers, as

prepared by the prosecutor's office, were entitled "In the Circuit Court of the First Circuit" and were clearly intended to be filed there. The officer in question was cross–examined as to why he presented the search warrant for signature to a district judge. At page 90 of the transcript of March 15, 1988, he was asked:

> Q. Well, the heading on each of these documents is ["]In the Circuit Court of the First Circuit, State of Hawaii["]. Did you contemplate going to a circuit judge and then change your mind?
>
> A. No, I never did. I followed the heading on this particular document is basically followed, is the one that form that we followed that was given to us by the Prosecutor's Office.
>
> Q. Were you aware — Excuse me?
>
> A. So, you know, it would be — it would be a form of ten plate (phonetic) kind of thing, at least for the first page; probably — probably the whole thing.

That explanation is to us incomprehensible.

It seems likely that the affidavit and warrant were drawn in a circuit court form, which followed the provisions of HRS Chapter 803, Part IV so that the Hawaiian Telephone Company would not question the orders in the warrant directed to it. Despite appellant's argument that HRS Chapter 803, Part IV is inapplicable to this case because no "wire communication" was involved, we note that the affidavit of the officer in question expressly cites that statute in both paragraphs 1 and 2 as authority for the issuance of the warrant, and those citations were repeated in the affidavits in support of both extensions. The record certainly does not demonstrate a good faith inadvertence in taking the warrant to a district judge. We thus uphold that portion of the order dealing with the pen register and electronic dialing information and any information derived therefrom.

## THE RESIDENTIAL SEARCH WARRANTS

Our ruling suppressing the information obtained by use of the pen register warrant, and its extensions, also removes from consideration, in support of the warrants for the search of appellee's house and Valentine's house, the information obtained by the pen register warrant and extensions, and the statements made in the affidavits in support of those

warrants based thereon. But those statements, even if we consider them, do not help to sustain the warrants for the house searches.

As we have noted, Article I, Section 7 of the Constitution of the State of Hawaii regarding searches and warrants provides that:

> no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

While the judge below enunciated several grounds for concluding that the warrants were invalid, we need deal with only one.

Our Constitution requires that the things to be seized be particularly described. That language appears also in the Fourth Amendment to the Constitution of the United States, and, historically, was so phrased to prevent the use of general warrants. The general warrant was a device, having the form, but not the substance, of legality, which the British King's government used as a basis for random searches of the American people's homes and places of business, for the purpose, not only of finding evidence of crimes but, of intimidating the people in the assertion of their rights. It is a device which tyrannical governments find extremely useful in the suppression of constitutional rights.

If the authorities have only to say "I have reason to believe that X has committed a crime based on what Y has told me" to get authorization to search X's home for anything and everything X possesses, then no one's papers or possessions are safe.

There is, of course, no dispute that "general warrants" are prohibited under our State Constitution and as well as under the Federal Constitution. The question that arises in each case, however, is whether or not the particular warrants involved were "general warrants".

In *State v. Kealoha*, 62 Haw. 166, 613 P.2d 645 (1980), Justice Nakamura, writing for an unanimous court, made a careful and scholarly review, in some detail, of the precedents and authorities in this area. There is therefore no need to reinvent the wheel, by another such review. As was noted, in that decision, there are warrants which contain prohibited general language but also contain a particularization of items, in which case the seizure of the particular items can be upheld, even though the seizure of other items under the general language cannot.

The prosecutor, or law officer, drawing a warrant is, to some extent, on the horns of a dilemma. If only certain items are described in the

warrant, then others cannot be seized. On the other hand, if the description of the items involved is too general, then the warrant is invalid and nothing can be seized. The fact that the task is difficult does not excuse a failure to do it correctly and constitutionally.

In *Kealoha, supra*, the cases of *United States v. Honore*, 450 F.2d 31 (9th Cir. 1971), *cert. denied*, 404 U.S. 1048, 92 S. Ct. 728, 30 L. Ed. 2d 740 (1972); *State v. Wiley*, 295 Minn. 411, 205 N.W.2d 667 (1973); and *Andresen v. Maryland*, 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976), were cited, as cases in which warrants had been upheld, despite the presence in them of language describing items in categories. Justice Nakamura said:

> There are critical differences between language commanding search for and seizure of "articles of personal property tending to establish . . . identification . . ." and the wording of the *Honore, Wiley*, and *Andresen* warrants. In *Honore* and *Wiley* broad general descriptions of the articles were particularized by specific examples of what was sought. Although the warrants were not models of specificity, the examples served to guide the executing officer and reviewing court in determining what items were or were not to be the objects of search and seizure. Absent such signposts, officers may "[seize] . . . one thing under a warrant describing another." [Citation omitted.] *Andresen* may be distinguished because broad language was substantially narrowed by reading the phrase "together with other fruits, instrumentalities and evidence of crime . . ." in conjunction with language focusing the permitted search on documents related to a particular parcel of land.
>
> No examples or other limiting language that could have effectively circumscribed the search and seizure of the executing officer were extant in this case. The breadth of the search the officer assumed was sanctioned is underscored by the wide variety of personal property listed in the police inventory . . . . The language in question too closely resembles the wording of a forbidden "general warrant" for us to ratify a seizure effected thereunder.

62 Haw. at 174–75, 613 P.2d at 650–51.

The language quoted above is equally apt in this case.

The particularized findings of the court below with respect to the way the search in Valentine's house and in appellee's house was conducted, by the officers executing the warrants, establishes clearly that the warrants were executed like general warrants. The officers even seized such items as family photographs and a birthday card received by appellee from his father.

The manner of execution is consistent with the language of the warrants themselves.

It is hard to imagine language which would encompass a broader and less particularized sweep of papers to be searched for than that used in the warrants in this case. The same can be said of the "articles of identification" and "currency" categories. We have searched the warrants, and indeed the affidavits upon which they were based, in vain for some particularization of the things to be seized, and have found none. Only the broadest of general categories are set forth. No specific document is anywhere described. No specific article to be seized is anywhere described.

The appellant relies upon the language, in the affidavits, as to the affiant's 11 years experience with drug enforcement, and his conclusions, or knowledge, that persons engaged in drug transactions keep books reflecting those transactions, and keep large amounts of cash on hand. Common sense tells one that is, probably, indeed so, but a reasonable belief, based on experience, that it is probable that an accused has documents in his home or in his bookkeeper's home, which will aid the prosecution, is not a substitute for the particularization, required by the Constitution of this State in the warrants, of the items to be seized.

The description of the items to be seized in the warrants for the search of appellee's home and of Valentine's home was so broad, general, and unparticularized as to make the warrants indisputably "general warrants". They consequently violated the Constitution of the State of Hawaii, and the items seized, pursuant to their execution, along with the fruits thereof, were properly suppressed by the court below. Affirmed.

*Jeffrey M. Albert*, Deputy Prosecuting Attorney, for appellant.

*David Bettencourt* for appellee Rothman.

Joinder on answering brief:

*Peter C. Wolff, Jr.* (Hart & Wolff) for appellee Samango.

*Michael A. Weight* for appellee Magers.

*Philip H. Lowenthal* and *Anthony L. Ranken* (Lowenthal, August & Graham) for appellee Sanchez.