No. 67,484

STATE OF KANSAS, *Appellee,* v. JOHN G. SCHULTZ, *Appellant.*

(850 P.2d 818)

Opinion filed April 16, 1993.

*Robert D. Hecht,* of Scott, Quinlan & Hecht, of Topeka, argued the cause, and *Deborah L. Hughes,* of the same firm, was with him on the brief for appellant.

*Kyle G. Smith,* assistant attorney general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, John G. Schultz, from his convictions of 10 counts of theft by deception involving his purchasing federal and state surplus property.

In Kansas, the Department of Corrections administers both the federal and the state surplus property programs. K.S.A. 75-52,118. In order to participate in the state program, an entity must qualify for federal eligibility. See K.S.A. 75-6601 *et seq.* Although there are differences between the federal and state surplus property programs, the differences are immaterial to this case.

On November 30, 1987, the City of Earlton, Kansas, (City) qualified as an eligible donee to acquire federal surplus property. The City also qualified for the state surplus property program. An authorization form was completed on behalf of the City and designated those authorized to sign on the City's behalf. The form listed Kemper Seltmann, "Board Chairman"; Larry Bailey, "Councilman"; John Schultz, "Purchasing Agent"; and Dalton Stewart, "Councilman." The form included the signature of each.

After the City qualified as an eligible donee, federal and state surplus property was purchased by Schultz in the City's name. Schultz purchased such things as diesel caterpillar engines, a forklift, a forklift truck, a road grader, a trailer, tons of scrap aluminum, a plow, and numerous trucks.

According to his deposition testimony, Dalton Stewart, city treasurer, in early 1988 became aware of purchases Schultz had made upon receipt of government documents asking how the City had utilized the items purchased. Stewart was concerned because the purchases had not been approved at any city council meeting and because the City had never received the property. He subsequently became aware of an additional, but unauthorized, checking account under the name of City of Earlton Industrial Development Fund.

The city council met on February 23, 1988, to discuss Schultz' purchases in the City's name. Schultz was present at the meeting and was instructed not to purchase any more surplus property in the City's name. The city council also voted to close the City of Earlton Industrial Development Fund checking account. The city council sent a letter to the surplus property headquarters in Topeka, stating that Schultz was no longer authorized to purchase property in the City's name. The State struck Schultz' name from the City's authorization card.

Agent David Christy of the Kansas Bureau of Investigation (KBI) began investigating Schultz' purchasing of surplus property. Pursuant to K.S.A. 22-3101(2) inquisition subpoenas, Christy obtained Schultz' bank records from the Bank of Commerce in Chanute, Kansas, and his telephone records from Southwestern Bell Telephone Company (SWB).

The State charged Schultz with 10 counts of theft by unauthorized control or, in the alternative, of theft by deception. Schultz moved to suppress the evidence or information obtained from the bank and SWB pursuant to the inquisition subpoenas. The trial court accepted the State's argument that Schultz had no standing to challenge the inquisition subpoenas and denied the motion to suppress. The defendant also filed a motion to dismiss, claiming the complaint failed to sufficiently charge the offense of theft by deception. The court denied the motion. Additionally, Schultz objected without success to the State's deposing of Dalton Stewart and to the trial court's order admitting Dalton Stewart's deposition into evidence at trial.

A jury convicted Schultz of 10 counts of theft by deception. The trial court suspended Schultz' sentence, placed him on supervised probation for two years, and fined him $5,000. The defendant filed numerous post-trial motions, which the trial court denied. The court, however, did grant the State's motion to release property Schultz had purchased to the Department of Corrections. Schultz filed a timely appeal. The appeal was transferred to this court, pursuant to K.S.A. 20-3018(c).

## I. STANDING

Schultz claims the trial court erred in denying his motion to suppress information and documents obtained by inquisition subpoenas. He contends the trial court erred in ruling he did not have standing to challenge the obtaining, issuance, and execution of the inquisition subpoenas.

Based upon *United States v. Miller*, 425 U.S. 435, 48 L. Ed. 2d 71, 96 S. Ct. 1619 (1976); *Southwestern Bell Tel. Co. v. Miller*, 2 Kan. App. 2d 558, 583 P.2d 1042, *rev. denied* 225 Kan. 845 (1978); and *Smith v. Maryland*, 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979), the trial court ruled that the defendant had no standing to object to subpoenas issued for his bank and

telephone records because he has no reasonable expectation of privacy in those records.

In *Miller,* 425 U.S. at 440, the United States Supreme Court reasoned that a bank depositor had no reasonable expectation of privacy in bank records because the documents were the bank's business records, not the depositor's "private papers." The Court stated:

"The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. . . .

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. [Citation omitted.] This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. [Citations omitted.]" 425 U.S. at 442-43.

In *Southwestern Bell Tel. Co.,* the Kansas Court of Appeals stated the *Miller* decision "establishes that bank customers have no Fourth Amendment interest in their bank records, so that such records could be lawfully obtained by a grand jury through subpoenas *duces tecum* addressed to a bank. We would suppose this disposes of any claim which might be made by [telephone] customers." 2 Kan. App. 2d at 565.

In *Smith,* the defendant challenged the warrantless installation and use of a pen register, which records numbers dialed on a telephone. The United States Supreme Court held that telephone customers have no reasonable expectation of privacy in the telephone numbers the customers have dialed. The Court reasoned:

"[W]e doubt that people in general entertain any actual expectation of privacy in the numbers they dial. All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed. All subscribers realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills. . . . Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this

information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret." 442 U.S. at 742-43.

The Court noted it consistently has held that an individual "has no legitimate expectation of privacy in information he voluntarily turns over to third parties. [Citations omitted.]" 442 U.S. at 743-44. See *United States v. Mountain States Tel. & Tel. Co., Inc.*, 516 F. Supp. 225 (D. Wyo. 1981)(no standing to raise Fourth Amendment claims to challenge subpoena used to obtain telephone toll records).

The scope of § 15 of of the Bill of Rights to the Kansas Constitution and of the Fourth Amendment to the United States Constitution "is" identical or "is usually" identical. Compare *State v. LeFort*, 248 Kan. 332, 334, 806 P.2d 986 (1991) ("is identical") and *State v. Deskins*, 234 Kan. 529, Syl. ¶ 1, 673 P.2d 1174 (1983) (scope "is identical" in "any particular factual situation") with *State v. Lambert*, 238 Kan. 444, 446, 710 P.2d 693 (1985) ("is usually considered to be identical") and *State v. Fortune*, 236 Kan. 248, Syl. ¶ 1, 689 P.2d 1196 (1984) (same).

This court, however, can construe our state constitutional provisions independent of federal interpretation of corresponding provisions. See *Oregon v. Hass*, 420 U.S. 714, 719, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975) ("a State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards"); *State v. Morgan*, 3 Kan. App. 2d 667, 672, 600 P.2d 155 (1979), *overruled on other grounds State v. Fortune*, 236 Kan. 248, 689 P.2d 1196 (1984). This court can interpret the Kansas Constitution to afford the citizens of Kansas more protection from governmental intrusion pertaining to bank and telephone records than that afforded by the United States Constitution. The United States Supreme court has acknowledged "the protection of a person's *general* right to privacy—his right to be left alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." *Katz v. United States*, 389 U.S. 347, 350-51, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967).

Schultz acknowledges the similarity in the language of § 15 of the Kansas Bill of Rights and the Fourth Amendment. As noted earlier, this court has held there is no significant difference between the two. They read as follows:

"The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or property to be seized." Kan. Const. Bill of Rights, § 15.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The defendant points out, however, that of the state courts declining to follow *Miller* and *Smith*, several of the state constitutions contained language almost identical to the language of the Fourth Amendment. According to the defendant, § 18 (justice without delay) and § 20 (powers retained by the people) of the Kansas Bill of Rights justify a more expansive interpretation of § 15. He argues that Kansas citizens should not be denied the right to be secure in their financial and telephone records simply because the Kansas Constitution and Bill of Rights are silent on the matter and that citizens of this state should be allowed to protect that right in a court of law.

Schultz stresses that his argument does not deny the government access to an individual's financial telephone records, but requires the government to obtain such records through lawful processes. The defendant's problem with regard to K.S.A. 22-3101(2) inquisition subpoenas is that these subpoenas are issued without judicial accountability and cannot be challenged in court. Thus, the door is open for prosecutorial abuse. In *Southwestern Bell Tel. Co.*, the telephone company argued there was a possibility of abuse if the prosecutor's discretion remained unfettered. The court responded there was no abuse in that case, but added: "[T]he courts are always open to prevent abuse in suits such as this one, if the need arises." 2 Kan. App. 2d at 566. Schultz asks how courts can prevent abuse if the party under investigation has no standing to challenge the inquisition subpoena. He con-

tends the telephone company and financial institution will not have sufficient interest to object to the subpoenaed records.

The defendant then discusses our state constitutional and common-law history. He argues that our state's firm belief in our right to establish independent state guarantees for Kansas citizens is illustrated by the spirited debates at the constitutional convention on the rights of slaves. Schultz provides other examples, including the fact that Kansas accorded women the right to vote and to hold public office eight years before the federal government granted the same right and that Kansas provided indigent criminal defendants the right to counsel in felony cases long before the federal government.

On the other hand, this court has never extended state constitutional protections beyond federal guarantees. Comment, *Interpreting the State Constitution: A Survey and Assessment of Current Methodology*, 35 Kan. L. Rev. 593, 618, 618 n.151 (1987).

Whether a bank or telephone customer has a reasonable expectation of privacy under the Kansas Constitution is a question of first impression in Kansas.

Schultz' final argument focuses upon criticism of *Miller* and *Smith*, beginning with the dissents filed in both cases. Justices Brennan and Marshall entered separate dissents in the *Miller* decision. Justice Brennan adopted the reasoning of the California Supreme Court in *Burrows v. Superior Court*, 13 Cal. 3d 238, 118 Cal. Rptr. 166, 529 P.2d 590 (1974), and quoted from such as follows:

" 'It cannot be gainsaid that the customer of a bank expects that the documents, such as checks, which he transmits to the bank in the course of his business operations, will remain private, and that such an expectation is reasonable. . . .

" '. . . A bank customer's reasonable expectation is that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes. . . .

" '. . . It is not the right of privacy of the bank but of the petitioner which is at issue, and thus it would be untenable to conclude that the bank, a neutral entity with no significant interest in the matter, may validly consent to an invasion of its depositors' rights. . . .

. . . .

" '. . . For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is

impossible to participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography. . . . To permit a police officer access to these records merely upon his request, without any judicial control as to relevancy or other traditional requirements of legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power.

" '. . . Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices.' [Citation omitted.]" 425 U.S. at 448-52.

Justices Stewart and Marshall entered separate dissents in the *Smith* decision. Justice Brennan joined both dissents. Justice Stewart asserted:

"[T]he Court today says that [the Fourth Amendment] safeguards do not extend to the numbers dialed from a private telephone, apparently because when a caller dials a number the digits may be recorded by the telephone company for billing purposes. But that observation no more than describes the basic nature of telephone calls. A telephone call simply cannot be made without the use of telephone company property and without payment to the company for the service. The telephone conversation itself must be electronically transmitted by telephone equipment, and may be recorded or overheard by the use of other company equipment. Yet we have squarely held that the user of even a public telephone is entitled 'to assume that the words he utters into the mouthpiece shall not be broadcast to the world.' [Citation omitted.]

. . . .

"The numbers dialed from a private telephone—although certainly more prosaic than the conversation itself—are not without 'content.' Most private telephone subscribers may have their own numbers listed in an publicly distributed directory, but I doubt there are any who would be happy to have broadcast to the world a list of the local or long distance numbers they have called. This is not because such a list might in some sense be incriminating, but because it easily could reveal the identities of the person and the places called, and thus reveal the most intimate details of a person's life." 442 U.S. at 746-48.

Justice Marshall noted that "[p]rivacy is not a discrete commodity, possessed absolutely or not at all." 442 U.S. at 749. He

disagreed with the Court's determination that individuals assume the risk if they convey information to third parties:

"Implicit in the concept of assumption of risk is some notion of choice. At least in the third-party consensual surveillance cases, which first incorporated risk analysis into Fourth Amendment doctrine, the defendant presumably had exercised some discretion in deciding who should enjoy his confidential communications. [Citations omitted.] By contrast here, unless a person is prepared to forgo use of what for many has become a personal or professional necessity, he cannot help but accept the risk of surveillance. [Citation omitted.] It is idle to speak of 'assuming' risks in contexts where, as a practical matter, individuals have no realistic alternative.

. . . .

". . . Privacy in placing calls is of value not only to those engaged in criminal activity. The prospect of unregulated governmental monitoring will undoubtedly prove disturbing even to those with nothing illicit to hide. Many individuals, including members of unpopular political organizations or journalists with confidential sources, may legitimately wish to avoid disclosure of their personal contacts. [Citations omitted.]" 442 U.S. at 749-51.

Several state courts have rejected the *Miller* holding and rationale, relying upon their own state constitutions to hold that bank customers have a legitimate expectation of privacy in their bank records. See *Burrows v. Superior Court*, 13 Cal. 3d 238; *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980) (en banc); *Winfield v. Div. of Pari-Mutuel Wagering*, 477 So. 2d 544 (Fla. 1985); *People v. Jackson*, 116 Ill. App. 3d 430, 452 N.E.2d 85 (1983); *Com. v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied* 444 U.S. 1032 (1980); *State v. Thompson*, 810 P.2d 415 (Utah 1991). For a general discussion of the search and seizure of telephone company records pertaining to a subscriber as a violation of that subscriber's constitutional rights, see Annot., 76 A.L.R.4th 536.

Prior to *Miller*, the California Supreme Court decided *Burrows*, which involved a bank's compliance with a law enforcement officer's informal oral request for the defendant's bank statements. It is this case upon which Justice Brennan based his dissent in *Miller*. California has reaffirmed its position since *Miller*. See, e.g., *People v. Blair*, 25 Cal. 3d 640, 159 Cal. Rptr. 818, 602 P.2d 738 (1979) (*Burrows* rationale also applicable to copies of defendant's credit card bills, record of defendant's telephone calls made from a hotel, and record of associate's telephone calls).

The Supreme Court of Colorado relied upon the *Burrows* rationale to hold that bank customers have a reasonable expectation of privacy, under the Colorado Constitution, in their bank records and, therefore, have standing to challenge a subpoena issued to the financial institution for the records. The court determined that "[c]ontrary to the rationale in *Miller*, there was not a true disclosure to a third party." *Charnes*, 200 Colo. at 99. Furthermore, according to the court, the government is not prohibited from obtaining bank records, but governmental access must be limited to the appropriate legal process and customers must have the opportunity to challenge the government's access during the legal process.

The Pennsylvania Supreme Court reversed a conviction, holding the Pennsylvania Constitution gave the defendant a reasonable expectation of privacy in her cancelled check, thus giving her standing to challenge the admissibility of the bank record, which was obtained through an invalid subpoena. After examining both *Burrows* and *Miller*, the court found the California case more persuasive "in recognizing modern electronic realities . . . than the simplistic proprietary analysis . . . used by the court in *Miller*." *DeJohn*, 486 Pa. at 47. The Pennsylvania court also noted that "*Miller* establishes a dangerous precedent, with great potential for abuse." 486 Pa. at 44.

An Illinois appellate court found the rationales of *Burrows*, *Charnes*, and *DeJohn* persuasive. The court stated:

"These courts rejected the rationale in *Miller* because it relies for its analysis of an expectation of privacy upon the ownership and possession of the records and not the reasonable expectations of the individual. The State courts accepted the fourth amendment test set out in *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507, which provides protection for 'people not places.' [Citations omitted.] Under *Katz*, the fourth amendment gives protection for an individual's reasonable expectation of privacy which is not bound by the location and present ownership of the records. Consequently, the right to privacy is not waived by placing these records in the hands of a bank. The individual can still legitimately expect that her financial records will not be subject to disclosure. [Citation omitted.]

. . . .

"We believe that it is reasonable for our citizens to expect that their bank records will be protected from disclosure because in the course of bank dealings, a depositor reveals many aspects of her personal affairs, opinion, habit and associations which provide a current biography of her activities.

Such a biography should not be subject to an unreasonable seizure by the State government. Furthermore, we reject the idea set out in *Miller* that a citizen waives any legitimate expectation in her financial records when she resorts to the banking system. Since it is virtually impossible to participate in the economic life of contemporary society without maintaining an account with a bank, opening a bank account is not entirely volitional and should not be seen as conduct which constitutes a waiver of an expectation of privacy. [Citation omitted.]" *People v. Jackson*, 116 Ill. App. 3d at 434-35.

Commentators have criticized the *Miller* decision. For example, Wayne LaFave has declared:

"The result reached in *Miller* is dead wrong, and the Court's woefully inadequate reasoning does great violence to the theory of Fourth Amendment protection which the Court had developed in *Katz*. . . .

"The Court's assertion in *Miller* that there can be no protected Fourth Amendment interest where there is 'neither ownership nor possession' is contrary to the purposes underlying the Fourth Amendment, the teachings of *Katz*, and the realities of modern-day life." 1 LaFave, Search and Seizure § 2.7(c), p. 511 (2d ed. 1987).

LaFave added:

"Though in *Miller* the authorities proceeded by subpoena, the thrust of the opinion is that the bank customer has no expectation of privacy and thus no Fourth Amendment protection no matter how egregious the police conduct which results in government acquisition of the information in the bank records. Thus, in *United States v. Payner*, 447 U.S. 727, 100 S. Ct. 2439, 65 L. Ed. 2d 468[, *reh. denied* 448 U.S. 911] (1980), where IRS agents arranged to have the bank records obtained by *burglary*, the Court without hesitation concluded that under *Miller* 'a depositor has no expectation of privacy and thus no "protectable Fourth Amendment interest" in copies of checks and deposit slips retained by his bank.' " 1 LaFave, p. 511 n.47.

Richard Posner has asserted:

"Privacy of information normally means the selective disclosure of personal information rather than total secrecy. . . . A bank customer may not care that the employees of the bank know a lot about his financial affairs, but it does not follow that he is indifferent to have those affairs broadcast to the world or disclosed to the government." Posner, The Economics of Justice, p. 342 (1981).

See Alschuler, *Interpersonal Privacy and the Fourth Amendment*, 4 N. Ill. U.L. Rev. 1, 21-28 (1983); Guzik, *The Assumption of Risk Doctrine: Erosion of Fourth Amendment Protection Through Fictitious Consent to Search and Seizure*, 22 Santa Clara L. Rev.

1051, 1068-72 (1982); Rasor, *Controlling Government Access to Personal Financial Records*, 25 Washburn L.J. 417 (1986); Comment, *Reasonable Expectations of Privacy in Bank Records: A Reappraisal of United States v. Miller and Bank Depositor Privacy Rights*, 72 J. Crim. L. & Criminology 243 (1981); Comment, *A Bank Customer Has No Reasonable Expectation of Privacy of Bank Records: United States v. Miller*, 14 San Diego L. Rev. 414 (1977).

Legislative history reflects that the United States Congress adopted the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.* (1988), in direct response to and as a criticism of the *Miller* decision:

"The title is a congressional response to the Supreme Court decision in . . . *United States v. Miller* which held that a customer of a financial institution has no standing under the Constitution to contest Government access to financial records. The Court did not acknowledge the sensitive nature of these records, and instead decided that since the records are the 'property' of the financial institution, the customer has no constitutionally recognizable privacy interest in them.

"Nevertheless, while the Supreme Court found no constitutional right of privacy in financial records, it is clear that Congress may provide protection of individual rights beyond that afforded in the Constitution." 1978 U.S. Code Cong. & Ad. News 9305, 9306.

With regard to administrative subpoenas, the Act requires that the customer have notice and an opportunity to object before the financial institution complies with the subpoena. 12 U.S.C. § 3405 (1988).

About one-third of the 50 states have enacted a state equivalent of the Right to Financial Privacy Act. See Ala. Code § 5-5A-43 (1981); Alaska Stat. § 06.05.175 (1988); Cal. Govt. Code § 7460 *et seq.* (West 1980); Conn. Gen. Stat. § 36-9j *et seq.* (1993); Fla. Stat. Ann. § 655.059 (West 1993 Supp.); La. Rev. Stat. Ann. § 6:333 (West 1993 Supp.); Me. Rev. Stat. Ann. tit. 9-B, § 161 *et seq.* (West 1980); Md. Code Ann., Fin. Inst. § 1-304 *et seq.* (1992); Mo. Rev. Stat. § 408.683 *et seq.* (1992 Supp.); Neb. Rev. Stat. § 8-1401 *et seq.* (1991); Nev. Rev. Stat. § 239A.010 *et seq.* (1991); N.H. Rev. Stat. Ann. § 359-C:1 *et seq.* (1984); N.C. Gen. Stat. § 53B-1 *et seq.* (1990); N.D. Cent. Code § 6-08.1-01 *et seq.* (1987); Okla. Stat. tit. 6, § 2201 *et seq.* (1991); Or. Rev. Stat. § 192.550 *et seq.* (1991); Tenn. Code Ann. § 45-10-101 *et*

*seq.* (1987). Thus, our neighboring states—Colorado by interpreting its constitution to give a right of privacy, and Missouri, Nebraska, and Oklahoma by statute—offer their citizens greater privacy rights in financial matters than does Kansas. Kansas has not enacted an equivalent version of the Act. The State argues that because the Kansas Legislature has not seen fit to enact a state version of the Right to Financial Privacy Act during the 16 years since *Miller* was decided, "the inference is clear that the legislature feel[s] no compelling urgency to adopt a statutory right where there is no constitutional right."

With regard to telephone records, numerous state courts have declined to follow *Smith v. Maryland*, 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979). As with the bank record cases, the following states have relied on their state constitutions to give their citizens a greater right than the United States Constitution offers. See *Blair*, 25 Cal. 3d at 653; *People v. Sporleder*, 666 P.2d 135 (Colo. 1983) (en banc); *Shaktman v. State*, 553 So. 2d 148 (Fla. 1989); *State v. Rothman*, 70 Hawaii 546, 779 P.2d 1 (1989); *State v. Thompson*, 114 Idaho 746, 760 P.2d 1162 (1988); *State v. Hunt*, 91 N.J. 338, 450 A.2d 952 (1982); *Com. v. Beauford*, 327 Pa. Super. 253, 475 A.2d 783 (1984); *State v. Gunwall*, 106 Wash. 2d 54, 720 P.2d 808 (1986).

The California Supreme Court reasoned:

"[A]s with bank records, a telephone subscriber has a reasonable expectation that the calls he makes will be utilized only for accounting functions of the telephone company and that he cannot anticipate that his personal life, as disclosed by the calls he makes and receives, will be disclosed to outsiders without legal process. As with bank records, . . . it is virtually impossible for an individual or business entity to function in the modern economy without a telephone, and a record of telephone calls also provides 'a virtual current biography.' " *Blair*, 25 Cal. 3d at 653.

The Colorado Supreme Court rejected the *Smith* holding and rationale for the following reasons:

"A telephone subscriber . . . has an actual expectation that the dialing of telephone numbers from a home telephone will be free from governmental intrusion. A telephone is a necessary component of modern life. It is a personal and business necessity indispensable to one's ability to effectively communicate in today's complex society. When a telephone call is made, it is as if two people are having a conversation in the privacy of the home or office . . . . [I]t is somewhat idle to speak of assuming risks in a context

where, as a practical matter, the telephone subscriber has no realistic alternative. [Citation omitted.]

"We view the disclosure to the telephone company of the number dialed as simply the unavoidable consequence of the subscriber's use of the telephone as a means of communication and the telephone company's method of determining the cost of the service utilized. . . . A person's privacy expectation should not depend on 'risks an individual can be presumed to accept when imparting information to third parties, but on the risks he should be forced to assume in a free and open society.' [Citation omitted.] . . . .

. . . .

"One's disclosure of certain facts to the telephone company as a necessary concomitant for using an instrument of private communication hardly supports the assumption that the company will voluntarily convey that information to others. . . .

". . . Simply stated, merely because the telephone subscriber has surrendered some degree of privacy for a limited purpose to those with whom she is doing business does not render the subscriber 'fair game for unrestrained police scrutiny' by virtue of that fact. [Citation omitted.]" *Sporleder*, 666 P.2d at 141-42.

The Pennsylvania appellate court explicitly set forth its reasons for rejecting *Smith*:

"According to the *Smith* majority a caller who dials a telephone in our society should expect that the police will have complete access to the numbers dialed because he provides them to the telephone company. The logic of this position escapes us. For all practical purposes an individual in America today has very little choice about whether the telephone company will have access to the numbers he dials and the frequency of times he dials them. The company has a virtual monopoly over vital communications media, and the individual must accept that this information will be collected by the company for billing purposes. It is quite another thing to suggest that the telephone caller should therefore expect that the company will turn this information over to a third party without legal process for a purpose unrelated to providing telephone service.

"On the contrary, we are convinced that a person picking up a telephone in his home or office fully expects that the number he is about to dial will remain as private as the contents of the communication he is about to have. That number provides a strong, sometimes conclusive inference as to whom is being called, unquestionably a private matter. The caller certainly evidences no intention to shed his veil of privacy merely because he chooses to use the telephone to make private contacts. In modern-day America the telephone call is a nearly indispensable tool used to conduct the widest range of business, government, political, social, and personal affairs. Certainly the vast majority of calls are unrelated to criminal enterprise, and yet the vast majority of callers would not think of allowing the destination

of their every call to be recorded by the police. Attaching a pen register to a phone line may reveal secrets as innocent as daily calls to mother. On the other hand, such surveillance might also reveal frequent calls to an illicit lover, or suspected organized crime figures, or suspected gamblers and bookmakers. Obviously, access to information about who is talking to whom, even without direct access to the contents of what they are saying, can be a powerful tool for either good or bad ends. In any case we do not hesitate to say that a caller and the person he calls expect and are entitled to as much privacy in the fact they are talking to one another as in what they say to each other.

"The fact that the telephone company and its employees in the course of providing telephone service collect information on the numbers dialed from a particular phone does not alter one whit the ordinary expectation that the prying eyes of government or anyone else will be kept in the dark absent legal process. Indeed, an expectation to the contrary—that information provided to the telephone company for a limited record-keeping purpose automatically becomes available to the police for criminal investigatory purposes—should have no foundation in a free society." *Beauford*, 327 Pa. Super. at 265-66.

Commentators also have criticized the *Smith* decision. See, *e.g.*, 1 LaFave, Search and Seizure § 2.7(b) (2d ed. 1987 and 1993 Supp.); Guzik, *The Assumption of Risk Doctrine: Erosion of Fourth Amendment Protection Through Fictitious Consent to Search and Seizure*, 22 Santa Clara L. Rev. 1051, 1073-78 (1982). For a general discussion, see Crook, *Sorry, Wrong Number: The Effect of Telephone Technology on Privacy Rights*, 26 Wake Forest L. Rev. 669 (1991).

The Kansas Legislature has had many years to adopt a privacy act and has not done so. That fact has no bearing on our interpretation of the Kansas Constitution.

The defendant offers intriguing reasons for this court to interpret § 15 of the Kansas Bill of Rights independently of its federal counterpart and to heighten the protection available to Kansas citizens. We obviously have authority to do so, and the fact we do not in this case does not foreclose the possibility of our doing so in a future case involving different issues. We are persuaded by the reasoning in *Miller* and *Smith* that, because the bank and telephone customer knows and understands others will see the records, the customer should have no expectation of privacy. There is no more expectation of privacy in bank and telephone records than there is, for example, in a confession to a minister

or in conducting legal business with a lawyer, both of which have statutes guaranteeing privacy (and a strong possibility of constitutional protection from areas other than privacy). The trial court did not err in holding the defendant had no standing to challenge the inquisition subpoena.

Having so held, the other issues the defendant raises concerning the inquisition subpoenas and proceedings are moot.

## II. SUFFICIENCY OF COMPLAINT/INFORMATION

The amended complaint/information charged Schultz with 10 counts of theft by unauthorized control, or in the alternative, of theft by deception. He contends the complaint/information did not sufficiently charge the offense of theft by deception and, therefore, his convictions are void.

Schultz argues the charge was insufficient because the complaint/information failed to allege specific elements of false pretenses, namely, that the State or federal government was deceived and that the State or federal government relied upon a false statement, false representation, or act of deception in parting with the surplus property. He bases his argument upon *State v. Finch*, 223 Kan. 398, 400, 573 P.2d 1048 (1978), in which this court concluded that the crime of theft by deception incorporated the former crime of obtaining property by false pretenses, and *State v. Handke*, 185 Kan. 38, 43, 340 P.2d 877 (1959), in which this court enumerated the four elements of obtaining money by false pretenses and declared the State must "aver and prove" all four elements.

The issue before the *Finch* court was what the State must prove to convict a defendant of theft by deception, not what the State must charge. Additionally, Schultz places too much reliance upon the *Handke* court's use of the word "aver."

In *State v. Bird*, 238 Kan. 160, 166, 708 P.2d 946 (1985), this court reviewed the principles governing sufficiency of the charge:

"In a felony action, the indictment or information is the jurisdictional instrument upon which the accused stands trial. [Citation omitted.] A conviction based upon an information which does not sufficiently charge the offense for which the accused is convicted is void. Failure of an information to sufficiently state an offense is a fundamental defect which can be raised at any time, even on appeal. [Citations omitted.] Sufficiency of the indictment or information is to be measured by whether it contains the elements

of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet, and by whether it is specific enough to make a plea of double jeopardy possible. [Citation omitted.]"

See *State v. Barncord,* 240 Kan. 35, Syl. ¶ 2, 726 P.2d 1322 (1986) ("An information which charges an offense in the language of the statute or its equivalent is sufficient."); *State v. Jackson,* 239 Kan. 463, 467, 721 P.2d 322 (1986) (" 'In Kansas all crimes are statutory and the elements necessary to constitute a crime must be gathered wholly from the statute.' ").

Here, the complaint/information charged in the language of the statute: "[o]btaining by deception control over property." See K.S.A. 21-3701. That is all that is necessary. The State is not required to allege all the elements of false pretenses in the charge.

The defendant next argues that the charge was not sufficient because it failed to state the specific false statement(s), false representation(s), or act(s) of deception upon which the charges were based. He erroneously cites *State v. Robinson, Lloyd & Clark,* 229 Kan. 301, 624 P.2d 964 (1981), for the proposition that a complaint/information is defective if it fails to allege the essential elements of the offense "within the *meaning* of the statute." (Defendant's emphasis.) What this court actually stated is that "if the allegations in an information fail to constitute an offense in the *language or meaning* of the applicable statute, the information is fatally defective." (Emphasis added.) 229 Kan. at 304.

Furthermore, the *Bird* court specified that "[a]lthough the accused has the right to know the nature of the charges against him, the information need not set forth all the specific evidentiary facts relied on to sustain the charge." 238 Kan. at 166. In *Bird,* this court held that the State's failure to allege in the information the manner or means by which a third party was to aid and abet in the murder, whom the third party was to aid and abet, and the identity of the intended victim was not a fatal defect. Schultz' argument is similar to the defendant's argument in *Bird* and fails for the same reason. It is not necessary to include the evidentiary details in the charge.

Schultz also argues that because the complaint/ information did not allege specific acts of deception, false statements, or false representations and because the State presented evidence of all three, he does not know upon which the jury relied to convict

him. Therefore, according to the defendant, he cannot challenge the sufficiency of the evidence. The defendant cites *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989), to support this argument.

In *Prouse*, this court addressed the problem of charging one offense but alleging two different means of commission in the same count. We do not have the same situation here. Schultz' argument is based on the erroneous assumption that each false statement, each false representation, or each deceptive act is a different means of committing the same offense. Theft by deception is one means of committing the offense of theft. An example of another means of committing the offense of theft is theft by obtaining unauthorized control over property. See K.S.A. 21-3701.

The trial court did not err in finding that the complaint/information was not defective.

## III. DEPOSITION OF DALTON STEWART

Schultz contends the trial court erred in allowing the State to take the deposition of Dalton Stewart and in admitting the deposition at trial. He claims that "unavailability" must be established both in the taking of the deposition and in admitting the deposition at trial and that the State failed to establish unavailability for either.

On appeal, both the defendant and the State cite K.S.A. 22-3211(3) as the governing statute. Subsection (3) provides, in part:

"If, upon hearing, the court determines that a prospective witness may be unable to attend or prevented from attending a trial or hearing, that the witness' testimony is material and that it is necessary to take the witness' deposition in order to prevent a failure of justice, the court may authorize the prosecuting attorney to take the deposition of the witness."

"Unable to attend" is not defined in any of the subsections of K.S.A. 22-3211 pertaining to authorization to take a deposition. The trial court relied upon the definition in subsection (8) of "unable to attend." K.S.A. 22-3211(8) governs the admissibility of the deposition at trial or at a hearing and provides in pertinent part: "At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence,

may be used if it appears that . . . (c) the witness is unable to attend or testify because of sickness or infirmity."

In *State v. Bird*, 238 Kan. at 171, this court determined that the trial court did not abuse its discretion in authorizing the taking of a witness' deposition under 22-3211(3) because the witness probably would be unable to attend due to illness. The witness' illness was established by her doctor's testimony that there was an 80 percent chance the witness would have a nervous breakdown if she had to testify at public trial. In *State v. Steward*, 219 Kan. 256, 260, 547 P.2d 773 (1976), we noted a "bare assertion" that the witness might be unable to attend is not sufficient. It is apparent this court accepts illness, if sufficiently supported by the evidence, as reason for a witness being unable to attend the trial.

In *Bird*, 238 Kan. at 171, this court held that allowing the taking of a deposition under 22-3211(3) is discretionary with the trial court. Thus, our standard of review is whether the trial court abused its discretion in so ruling. "The test of the trial court's abuse of discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision." *Taylor v. State*, 251 Kan. 272, Syl. ¶ 3, 834 P.2d 1325 (1992).

Here, the trial court found Stewart unable to attend because of illness, based upon his doctor's testimony that testifying at trial would threaten his health. Immediately prior to the court's finding, Dr. Pam Maben, Stewart's physician, testified by telephone conference. The doctor testified that Stewart, age 68, had severe coronary heart disease; that he had undergone bypass surgery in 1984 and a heart catheter in 1986; that he had a stroke in 1985; and that he was on medication for both problems. In Dr. Maben's opinion, the stress of testifying could jeopardize Stewart's health. A reasonable person would agree with the court's finding that Stewart was unable to attend because of health problems.

At a hearing held on July 3, 1990, to determine whether to admit the deposition at the preliminary hearing, the trial court stated that it had determined Stewart to be a material witness in August 1989.

On September 4, 1990, during the preliminary hearing, Schultz objected, alleging that no evidence had been presented and that

the trial court had not ruled on whether the witness was material and whether preservation of the testimony was necessary to prevent a failure of justice. The State contended the defendant had not been prejudiced in any way, but suggested the trial court comply retroactively with the statute. The trial court responded:

"Well, I think the Court has no difficulty in making those findings at this point in time. Based upon the contents of the court file, including the charges and affidavit contained therein, it is the Court's view that there is a sufficient basis for the Court to find at this time, and I don't think that a finding at this point in time in any way affects the rights of the parties or prejudices the parties, I therefore find that [Dalton Stewart] is a material witness and that the failure to produce this witness would result in a failure of justice unless we do proceed with the deposition at the preliminary hearing stage. . . . I therefore find that the requirements of K.S.A. 22-3211 with respect to unavailability, materiality, and failure of justice have been met—or, I should say, there is sufficient basis for the court to make those findings under the statute. And the Court would so order."

At the July 26, 1989, suppression hearing, prior to the court's authorization for Stewart's deposition to be taken, KBI Agent Christy testified he had interviewed Stewart. Christy's investigative reports of the two interviews were entered into evidence. According to the reports, Stewart said that the City did not have any of the surplus property Schultz had purchased; that Schultz had never been a purchasing agent for the City; that Kemper Seltmann told him about an arrangement with Schultz in which Schultz would pay the City five percent of what Schultz paid for surplus property bought in the City's name; that, for reasons unknown to Stewart, Schultz had written two checks to the City totaling $846.14; that Stewart had become aware of a checking account in the name of City of Earlton Industrial Development Fund; and that the city council called an emergency meeting at which Schultz was present to discuss these matters. Based upon these reports, Stewart was a material witness. We cannot say the retroactive finding prejudiced the defendant and, thus, do not find error.

At a hearing held on July 3, 1990, to determine whether to admit Stewart's deposition at the preliminary hearing, Dr. Pam Maben again testified by telephone. She confirmed her earlier evaluation. Dr. Maben mentioned she was concerned about Stewart's health. He had been under additional stress because of his

nephew's death, the result of which had been documented in heart rhythm difficulties such as additional heartbeats and skipped heartbeats. The doctor was concerned about further stress, including self-induced stress about appearing in open court. The doctor said that Stewart's health had not improved dramatically since she had last testified in August 1989. Dr. Maben subsequently testified in person on August 14, 1990. In addition to confirming what she previously had said, she mentioned that Stewart's bypass surgery had been a quadruple bypass. Because stress precipitated his chest pains, the doctor had instructed Stewart to reduce the stress in his life. She also had prescribed nerve medications, Valium and Tranxene, for him. The doctor said that Stewart ended up in the hospital with chest pain within one month after his deposition was taken, that she expected a similar reaction if he testified at the preliminary hearing or at the trial, and that she did not believe he should testify. The trial court admitted the deposition for preliminary hearing purposes.

When the issue arose at trial, the trial court ruled to admit the deposition testimony for the following reasons: Dr. Maben consistently had maintained that testifying in open court could be detrimental to Stewart's health, and there had been no medical evidence contrary to Dr. Maben's opinion. The court also noted that it had dealt exhaustively with the issue. Because a reasonable person would agree with the trial court's ruling, the ruling is not an abuse of discretion.

Schultz also argues that, prior to the reading of the Stewart deposition into evidence at trial, the trial court erred in not striking the references in the deposition to exhibits never offered or admitted into evidence at the deposition. The defendant raised this argument to the trial court in a motion to strike. The trial court denied Schultz' motion, finding it "unpersuasive." Several of the deposition exhibits previously had been admitted into evidence at trial. The trial court admitted the others into evidence, taking into account the requisite foundation and relevancy requirements.

For support, the defendant cites K.S.A. 1992 Supp. 60-232(b) for the proposition that a party can object at trial to the admissibility of any deposition. The statute provides, in relevant part: "[O]bjection may be made at the trial or hearing to receiving in

evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying." Schultz does not explain why the exhibits would have been inadmissible if Stewart had been present and testifying at trial.

Two concerns Schultz advances on appeal are that he was denied the opportunity to object to the admissibility of the exhibits because they were not offered into evidence and that there was no testimony linking deposition exhibits with trial exhibits. Although the defendant may not have had the opportunity to object to the exhibits at the deposition, he had the opportunity at trial. Regarding the deposition exhibits already admitted into evidence, Schultz could have objected when the exhibits initially were offered into evidence at trial. Regarding the deposition exhibits the trial court admitted into evidence in response to the defendant's motion, Schultz could have made a specific objection to a specific exhibit at the time of the court's ruling. He did not do this. Regarding his second concern, it is true there was no specific testimony to the jury explaining, for example, that Deposition Exhibit No. 1 was the same as State's Exhibit No. 10. Nonetheless, because the question or answer in the deposition described the exhibit, it would not have been difficult for the jury to determine the corresponding trial exhibit.

"Admission or exclusion of evidence is within the sound discretion of the trial court, subject to exclusionary rules." *State v. Friberg*, 252 Kan. 141, Syl. ¶ 5, 843 P.2d 218 (1992). The trial court did not abuse its discretion in admitting the deposition exhibits. Because the deposition exhibits were admitted into evidence, there was no need to strike deposition references to them.

Schultz' final argument regarding Stewart's deposition is that the trial court erred in not striking statements attributed to Kemper Seltmann in the deposition. Stewart testified that Seltmann came over to his house on November 22, 1987, with donee application papers for him to sign. Stewart stated Seltmann asked him if it would be okay for Schultz to make surplus property purchases. Stewart responded it would be okay if it was legal and if Schultz paid for items with his personal check and did not use the City's checking account. Stewart said Seltmann told him

Schultz agreed to pay the City five percent of the purchase price on all surplus property Schultz purchased.

The defendant lodged numerous objections to the admission of Seltmann's hearsay statements. The trial court overruled Schultz' objection, finding that Seltmann's statements were admissible under the coconspirator exception to the hearsay rule, K.S.A. 1992 Supp. 60-460(i), which provides:

"As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

In *State v. Bird*, 238 Kan. 160, 176, 708 P.2d 946 (1985), this court set forth the five prerequisites for utilizing this statute:

"(1) [T]he person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been outside the presence of the accused; (4) the statement of the coconspirator must have been made while the conspiracy was in progress; and (5) the statement must be relevant to the plan or its subject matter."

The *Bird* court added that "even if all five of these elements are satisfied, the testimony is not admissible unless evidence, other than the proffered out-of-court statement, is already in the record which establishes a 'substantial factual' basis for a conspiracy between the defendant and the declarant." 238 Kan. at 176.

The trial court noted that Seltmann was unavailable as a witness because he was awaiting trial on charges arising out of these same events and because he had invoked his privilege against self-incrimination. The court then stated:

"The declarant in this case is Kemper Seltmann, the party is Mr. Schultz. There is sufficient evidence from the totality of the record in the preliminary hearing for the Court to determine that there was a joint plan on the part of Kemper Seltmann and the defendant to commit a crime and, therefore, under the aforesaid statute, the statements of Kemper Seltmann being relevant to its plan, to the plan or its subject matter and made while the plan was in existence and before its termination would come within that exception."

Citing *State v. Sherry*, 233 Kan. 920, 667 P.2d 367 (1983), the trial court concluded that the *Sherry* court "probably considered evidence adduced at the preliminary hearing, and the Supreme

Court states that: 'The evidence introduced at the preliminary hearing was sufficient to establish a conspiracy . . . .' "

Schultz contends the trial court misinterpreted *Sherry* and erred in relying upon evidence presented at the preliminary hearing to establish the existence of a conspiracy. In *Sherry*, this court stated that "[t]he evidence introduced at the preliminary examination was sufficient to establish a conspiracy." 233 Kan. at 934. As pointed out by the defendant, *Sherry* involved the admission of a coconspirator's hearsay statement at the preliminary hearing. Schultz claims that, for this purpose, only evidence presented at trial may be considered. For support, the defendant cites *State v. Borserine*, 184 Kan. 405, 410-11, 337 P.2d 697 (1959), in which this court stated:

"Ordinarily when acts and declarations of one or more co-conspirators are offered in evidence against another co-conspirator by a third party witness or witnesses, the conspiracy should first be established *prima facie*, and to the satisfaction of the trial judge. But this cannot always be required. Where proof of the conspiracy depends on a vast amount of circumstantial evidence—a vast number of isolated and independent facts—it cannot be required. In any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced at the trial taken together shows that a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before, or after, the introduction of such acts and declarations. (*State v. Winner*, 17 Kan. 298 [1876].)"

See *State v. Nirschl*, 208 Kan. 111, Syl. ¶ 2, 490 P.2d 917 (1971) (In this context, we have said "evidence extrinsic to such out of court declaration must be in the record to establish some substantial factual basis of the existence of such conspiracy.").

The trial court erred in stating that the evidence presented at the preliminary hearing was sufficient to establish a conspiracy. The error, however, is harmless. As the *Borserine* court noted, as long as the evidence at trial taken together establishes the existence of a conspiracy, it does not matter at what point in the trial the evidence was offered.

" 'To establish a conspiracy it is not necessary that there be any formal agreement manifested by formal words, written or spoken; it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose and this may be inferred from sufficiently significant circumstances.

" 'While an agreement is a necessary element of a conspiracy, the existence of the agreement need not be proved directly, but may be inferred from

other facts proved. If one concurs in a conspiracy, no proof of an agreement to concur is necessary to establish his guilt.' [Citation omitted.]" *Sherry*, 233 Kan. at 934.

Here, there was evidence, absent Seltmann's hearsay statements, establishing the existence of a conspiracy between Seltmann and the defendant to purchase surplus property. Stewart testified that when he signed the authorization card, only his name and Larry Bailey's name were listed. Seltmann's and Schultz' names were not listed at that time, evidently being added later. Schultz misrepresented himself to the surplus property personnel as the City's purchasing agent. Seltmann was misrepresented as being the board chairman. An additional, but unauthorized, checking account for the City was discovered under the name of the City of Earlton Industrial Development Fund. Only Seltmann's name was on the signature card; however, a check written on Schultz' business account opened up the account. There was evidence Schultz had deposited money into this account. All of the cancelled checks for this account, except the one to close the account, were made payable to "Surplus Property Fund."

There was sufficient evidence offered at trial to establish a conspiracy between Seltmann and Schultz. "The decision of a trial court, if correct, is to be upheld even though the court may have relied upon an erroneous ground or reason for its decision." *Sharp v. State*, 250 Kan. 408, Syl. ¶ 6, 827 P.2d 12, *cert. denied* ___ U.S. ___, 113 S. Ct. 194 (1992). The trial court did not err in admitting Seltmann's statements.

## IV. FEDERAL SURPLUS PROPERTY RESTRICTIONS

Schultz argues the trial court erred in admitting evidence of use and disposal restrictions pertaining to federal surplus property because none of the property charged as having been stolen in the complaint was subject to the federal restrictions. He claims the federal restrictions do not apply because Kansas has not complied with federal law governing state distribution of federal surplus property. One of the defendant's claims of noncompliance is that Kansas has failed to develop "a detailed plan of operation" for the distribution of federal surplus property, as required by 40 U.S.C. § 484(j)(4)(A) (1988).

The issue before the court was not whether Kansas has been complying with federal surplus property regulations, but whether the defendant committed theft by deception. The federal government determines whether Kansas is complying with federal law and qualifies for continued participation in the federal surplus property program.

A reasonable person would agree that a working knowledge of the state and federal surplus programs was relevant to the jury's determination. The trial court did not abuse its discretion in admitting the regulations.

## V. SUFFICIENCY OF THE EVIDENCE

Schultz makes several sufficiency of the evidence arguments. He maintains that even if the federal restrictions do apply, the evidence was insufficient to show his conduct violated the use and disposal regulations. In other words, he claims the State failed to prove he did not use the federal surplus aluminum for economic development or other public purpose, which is permitted under the federal regulations. See 41 C.F.R. § 101-44.200(a) (1987), 41 C.F.R. § 101-44.207(a)(7) (1987), 41 C.F.R. § 101-44.207(b)(2) (1987).

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Grissom*, 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992).

Under the federal program, a private citizen is not allowed to purchase surplus property directly from the surplus property center. The only time a private citizen can purchase federal surplus property is at public auctions. At the time the purchases were made in this case, a private citizen could purchase state surplus property after it had been offered for sale for at least 60 days. K.S.A. 75-6602.

Schultz bought aluminum from the surplus property program. An invoice dated January 20, 1988, showed Schultz had bought 5,812 pounds of miscellaneous aluminum at 10 cents per pound for a total of $581.20. An invoice dated January 29, 1988, showed Schultz had bought 7,000 pounds of miscellaneous aluminum at 10 cents per pound for a total of $700. An invoice dated February

11, 1988, showed Schultz had bought 11,024 pounds of aluminum plate at 20 cents per pound for a total of $2,204.80. The checks were written on the City of Earlton Industrial Development Fund account.

The assistant director of the federal division of the surplus property program testified that Schultz told him "the aluminum would be used in a Vo-tech program that he was developing and the sheets of aluminum would be used to repair buildings" in Earlton. One of the defense witnesses, Eldon Cleaver, testified he was in the scrap business and had bought scrap aluminum from the defendant. The State produced a copy of a check written on Cleaver's business account to John Schultz on January 27, 1988, in the amount of $16,500. Cleaver testified he could not remember how much he paid per pound for the aluminum. He made a subsequent buy in February 1988. Cleaver resold the aluminum.

Additionally, there was evidence that the City had never authorized Schultz to act as its purchasing agent, that the City had not approved or received the purchases, and that the City was unaware of and had never authorized the City of Earlton Industrial Development Fund bank account.

There was no evidence presented that the aluminum was used for economic development or another public purpose. A jury reasonably could conclude Schultz sold the aluminum to Cleaver for personal profit. The State presented sufficient evidence for a rational factfinder to conclude beyond a reasonable doubt that Schultz had not used the property purchased for economic purposes, other than his own, or for public purposes.

The defendant also asserts several reasons why the evidence failed to show he obtained the surplus property by deception. He first argues that the State failed to prove the City was never an authorized eligible donee. Whether the City was an authorized eligible donee is not the issue—the City was not on trial for the 10 counts of theft by deception. Furthermore, there was evidence Schultz obtained the City's signatures on the application forms by deception. Stewart testified that when Kemper Seltmann brought him the authorization documents to sign, Seltmann asked him if it would be okay for Schultz to buy surplus property. Stewart said it would be okay if it was legal and the surplus

property office would accept Schultz' personal check, but that Schultz' purchases were not to go through the City's checking account. Stewart also stated that when he signed the signature card only his name and Larry Bailey's name were listed on the card. Schultz' and Seltmann's names were not listed at that time.

Schultz then contends the State failed to show he was not an authorized purchasing agent for the City. There was evidence to the contrary. Stewart, the city treasurer, testified that the question of appointing a purchasing agent in general, or Schultz specifically, had never been discussed at a formal or informal city council meeting during the eight years he had been serving on the council. Stewart expressly testified that at no time did he ever knowingly authorize Schultz to be a purchasing agent for the City. According to Stewart, the City had never approved any of the purchases Schultz had made, had never received any of the property Schultz had purchased, and had never bought surplus property. Dean Buster, another city council member, confirmed that the City had never appointed Schultz to act as its purchasing agent. Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational factfinder to find beyond a reasonable doubt that Schultz was not an authorized purchasing agent for the City.

Schultz next argues no theft occurred because the government received its asking price and suffered no monetary loss. For support, the defendant cites *State v. Palmer*, 50 Kan. 318, 324, 32 Pac. 29 (1893), in which this court stated:

"The mere obtaining of money under false pretenses does not alone constitute a crime. The money must be obtained to the injury of some one. Though money is obtained by misrepresentation, if no injury follows, no crime is accomplished. In this case, the defendant was undoubtedly guilty of many flagrant misrepresentations and other dishonest acts; but if all such misrepresentations and dishonorable acts did not actually result in injury to McClelland, [the defendant] cannot be convicted in this state simply because upon the face of things she is bad."

In *Palmer*, the defendant was charged with having obtained money under false pretenses. Francis McClelland lent the defendant money to invest in her business of buying and selling silkworm eggs. The defendant put up three notes as security, in the amounts of $700, $1,500, and $3,000. There was some evi-

dence, although it was not conclusive, that the $3,000 note was worthless. There was no evidence the other two notes were not worth their face value. McClelland did not attempt to collect upon any of the notes. In holding that McClelland had not been defrauded, this court reasoned: "If these two notes are good and collectible, McClelland has at least $2,200 in security for less than $1,300 that he let the defendant have and did not get back." 50 Kan. at 324.

*Palmer* can be distinguished factually from the case at hand. Additionally, the *Palmer* court did not define "injury." Although it expressly was noted in *Palmer* that there had been no injury, the same cannot be said here. At the very least, Schultz' actions deprived eligible donees from purchasing the surplus property and thwarted the purpose of the program.

Furthermore, K.S.A. 21-3701 does not require that the property in question be obtained to the injury of another. The statute provides in pertinent part:

"Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property:

. . . .

"(b) Obtaining by deception control over property."

The legislature has defined several of the words used in the theft statute. " 'Deception' means knowingly and willfully making a false statement or representation, express or implied pertaining to a present or past existing fact." K.S.A. 21-3110(5). " 'Obtain' means to bring about a transfer of interest in or possession of property, whether to the offender or to another." K.S.A. 21-3110(11). " 'Obtains or exerts control' over property includes but is not limited to, the taking, carrying away, or the sale, conveyance, or transfer of title to, interest in, or possession of property." K.S.A. 21-3110(12). This court has acknowledged the crime of theft by deception incorporates the prior crime of obtaining money by false pretenses. Hence, in order to prove theft by deception the State must prove that the defendant obtained control over the property by means of a false statement or misrepresentation, that the false statement or misrepresentation deceived the victim, and that the victim in whole or in part relied upon the false statement in relinquishing control of the property

to the defendant. *State v. Rios*, 246 Kan. 517, 526-27, 792 P.2d 1065 (1990).

Schultz also claims the evidence was insufficient because the State relied upon representations of a future act as the basis for an ongoing theft by deception and did not rely upon past or present existing facts. See *State v. Ringi*, 238 Kan. 523, 529, 712 P.2d 1223 (1986) ("An assurance as to a future transaction, however false or fraudulent it may be, is not a false pretense that lays the foundation for a criminal prosecution."); K.S.A. 21-3110(5). The defendant cites to the compliance audit forms as an example. Surplus property purchasers are sent compliance audit forms, asking if the property purchased has been placed in use, how it is being used, and if it has saved the purchaser money. These forms also describe the property purchased and list the serial number of the purchased property. The defendant objected to testimony about these forms, arguing that no compliance audit forms had been sent with regard to the property charged as having been stolen in this case.

The trial court asked the State to explain the relevance of these forms to the case at hand. The State explained that two sets of compliance audit forms had been sent regarding property purchased by Schultz. Kemper Seltmann had signed the first set, stating that the property was in appropriate use or that it was not economically feasible to repair the particular item and usable parts were being retained. After this matter came to light, an identical set of forms was sent to the City. Dalton Stewart, as city clerk and treasurer of Earlton, signed the forms, certifying the property was not in the City's possession. The State then argued:

"The relevance is . . . this property never went to the City of Earlton and the whole thing about even it being purchased by the City of Earlton, it's a sham. And the reason . . . that's true is in part and parcel because of what those documents say. That a lot of those items that were listed on those particular documents never went to Earlton and Earlton never had them. And this is evidence that shows the conspiracy, if you will, or the overall plan for this defendant to take them immediately into his possession, and the City of Earlton had nothing to do with this."

The trial court responded: "So, in a nutshell what you're saying this shows is the ongoing plan . . . [of] deception for the purpose of the private use of the defendant?"

The defendant erroneously equates the trial court's use of the word "ongoing" with representations of a future act. Although Schultz' statement of the law is accurate, his application of the law to the facts is not. The compliance audit forms concern past or present existing facts.

In conclusion, there was evidence the defendant obtained control over the surplus property by means of a false statement or misrepresentation. He was instrumental in qualifying the City as an eligible donee; however, he misrepresented the program and its legal ramifications to the City. He misrepresented himself to the state and federal surplus property programs as the City's purchasing agent. Schultz indicated the purchases would be used for economic development or public purposes. The directors of the state and federal surplus property programs testified they believed Schultz to be the City's purchasing agent and had they not believed him, he would not have been eligible to purchase surplus property. Considering all the evidence in the light most favorable to the State, there was sufficient evidence for a jury to find Schultz guilty of theft by deception.

## VI. RELEASE OF SEIZED PROPERTY

KBI Agent Christy recovered surplus property from a warehouse owned by the defendant on May 26, 1988. The property was received with the consent and cooperation of the defendant and his attorney. After the verdict of- guilty, the State filed a motion asking the trial court to order the release of the property to the government, which the trial court granted over Schultz' objections.

On appeal, the defendant claims the trial court erred in releasing the property because none of the recovered surplus property was implicated in any of the theft counts of which he was charged and convicted. Schultz points out that the government was paid its asking price for this property and that neither the City nor he was reimbursed for the purchase price. Therefore, according to the defendant, his due process rights were violated. Neither side cites any authority.

In granting the State's motion, the trial court stated:

"Legal title cannot be fully litigated in this proceeding, if there are legal title questions. The duty of the Court is to consider restitution. Restitution

is defined, in the context in the instant case, as the restoration of property to the lawful owner.

"It appears to the Court, from the evidence I received, that the federal government is the lawful owner. If the property in question were still in possession of the defendant, the Court would order him to turn it over. . . . I simply reaffirm and approve the fact that it has been restored to the federal government but I do not feel I can go beyond this finding because if there are civil issues involving the property or the amounts paid I think they are beyond the proper purview and jurisdiction of the Court."

Based on the arguments made in the trial court and in this court, we cannot say the trial court erred in so ruling. The defendant's remedy, if any, is by a separate action.

Affirmed.

DAVIS, J., not participating.

ALLEGRUCCI, J., dissenting: I do not agree with the majority's holding that the defendant did not have standing to challenge the inquisition subpoena. At issue is whether the defendant has a reasonable expectation of privacy under § 15 of the Bill of Rights of the Kansas Constitution.

The United States Supreme Court has held that bank depositors and telephone customers have no reasonable expectation of privacy in those records under the Fourth Amendment to the United States Constitution. For that reason, a defendant has no standing to raise a Fourth Amendment claim to challenge a subpoena to obtain those records.

As the majority points out, we are not bound by the decision of the United States Supreme Court in interpreting our own state constitution. We are free to interpret § 15 of the Bill of Rights of the Kansas Constitution to afford greater protection to our citizens than does the Fourth Amendment.

Justice Abbott, opining for the majority, has discussed in great detail the holdings in *United States v. Miller*, 425 U.S. 435, 48 L. Ed. 2d 71, 96 S. Ct. 1619 (1976), *Smith v. Maryland*, 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979), and related

state cases, both pro and con. The line is clearly drawn, and I find myself on the side opposite the majority.

I would reject the holding and rationale of the majority in *Miller* and *Smith* and embrace the rationale of the dissenting opinions of Justices Stewart, Marshall, and Brennan.

To free men and women, the right of privacy is the glue that holds together the very fabric of a free society and the rights guaranteed by both the United States and Kansas Constitutions. The most intimate details of one's personal life are just as sacred to the citizens who have nothing to hide as to those who do.

I do not find it unreasonable for Kansas citizens to expect their telephone and banking records will be protected and used only for internal purposes by the respective institutions. Absent an express waiver of that reasonable expectation of privacy or compulsory legal process, such records are not subject to disclosure. The very personal nature of such records mandates such a conclusion.

I believe the defendant has a reasonable expectation of privacy under § 15 of the Bill of Rights of the Kansas Constitution and thus has standing to challenge the inquisition subpoena. I would reverse the defendant's conviction and remand for a new trial.

SIX, J., joins in the foregoing dissenting opinion.